UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

**ORIGINAL**

FILED
IN CLERK'S OFFICE
U S DISTRICT COURT E.D.N.Y.

★ APR 2 2 2019 ★

BROOKLYN OFFICE

WILLIE BROWN,

                Plaintiff,

   -v-

THE CITY OF NEW YORK, THE NEW YORK CITY POLICE
DEPARTMENT, POLICE OFFICER POM SEDA, A. (Shield #8473),
POLICE SERGEANT ALTHAIBANI, A.
The individual defendants sued individually and in
their Official capacities,

                Defendants.

: CIVIL RIGHTS
: COMPLAINT

: Complaint No.:

**CV 19-2441**

: Jury Trial Requested

**MATSUMOTO, J.**

**BLOOM, M.J.**

## COMPLAINT FOR VIOLATION OF CIVIL RIGHTS
### PARTIES TO THIS COMPLAINT

    A) <u>The Plaintiff</u>: WILLIE BROWN, DIN#17R1884. Plaintiff is currently in the custody of the New York State Department of Corrections and Community Supervision (herein after DOCCS). Plaintiff currently resides at: Riverview Correctional Facility, 1110 Tibbits Drive, P.O. Box 247, Ogdensburg, New York 13669.

    Plaintiff WILLIE BROWN, was and still is a Citizen of the State of New York, Kings County.

    B) <u>The Defendants</u>:

    <u>Defendant No. 1</u>: THE CITY OF NEW YORK. At all times referred herein, defendant THE CITY OF NEW YORK, was and still is a municipal corporation organized under the laws of the State of New York, its place of business being in the State of New York. At all times herein, defendant THE CITY OF NEW YORK, was and still the employer of THE NEW YORK CITY POLICE DEPARTMENT, was and still is the employer of the individual defendants POLICE OFFICER POM SEDA, A. and POLICE SERGEANT ALTHAIBANI, A.; was and still is responsible for the policies practices and customs of THE NEW YORK CITY POLICE DEPARTMENT, which is also a defendant herein.

**Defendant No. 2:** THE NEW YORK CITY POLICE DEPARTMENT. Defendant No. 2 address is: New York City Police Department, Headquarters, 1 Police Plaza, New York, New York 10038.

At all times herein, defendant the NEW YORK CITY POLICE DEPARTMENT, was and still is a municipal corporation organized under the law of the State of New York, which violated plaintiff's rights described herein. Defendant, NEW YORK CITY POLICE DEPARTMENT, was and still the employer of the individual defendants, was and still is responsible for the policies and customs of POLICE OFFICER POM SEDA (Shield #8473), and POLICE SERGEANT ALTHAIBANI.

**Defendant No. 3:** POLICE OFFFICER POM SEDA (Shield #8473, 79 Precinct). Defendant. No.3 address is: New York City Police Department, Patrol Borough Brooklyn North, 79th Precinct, 263 Tompkins Avenue, Brooklyn, New York 11216. POLICE OFFICER POM SEDA (Shield #8473) (hereinafter, P.O. SEDA) is sued in his Official and Individual capacity. This defendant is a Citizen of New York State.

**Defendant No. 4:** POLICE SERGEANT ALTHAIBANI. Defendant No. 4 address is: New York City Police Department, Patrol Borough Brooklyn North, 88th Precinct, 298 Classon Avenue, Brooklyn, New York 11205. POLICE SERGEANT ALTHAIBANI (herein after SGT. ALTHAIBANI) is sued in his Official and Individual capacity. This defendant is a Citizen of New York State.

## BASIS FOR JURISDICTION AND VENUE

This Civil Rights Complaint is brought pursuant to 42 U.S.C. § 1983, and the Fourth, Eighth, and Fourteenth Amendments of the United States Constitution. Jurisdiction is proper before this Court by the aforesaid statutes, and 28 U.S.C. §§ 1331 and 1343.

Venue is proper before this Court pursuant to 28 U.S.C. § 1391 because the events and acts in question arose in Kings County, New York, and the City of New York, New York County. Which are subject to personal jurisdiction in

-2-

the Eastern District of New York.

### PRELIMINARY STATEMENT

1. Plaintiff was falsely arrested, imprisoned and illegally seized in violation of his Constitutional rights to be free from illegal seizure by Officers and a Sergeant who were employees of the NEW YORK CITY POLICE DEPARTMENT, Herein after referred to as the "NYPD." Plaintiff had an assault and battery committed to his person, in violation of his 4th, 8th, and 14th Amendment rights under the U.S. Constitution, by the employees of the NYPD. At all times the Police Officer and Sergeant herein were acting under color of State law in the scope of their employment as City    of New York Police Officers. The officers involved in the instant action were negligently supervised by the CITY OF NEW YORK. Furthermore, the CITY OF NEW YORK police officers did not have probable or reasonable cause, or a valid arrest warrant to detain and issue process against plaintiff. At no time during this incident did plaintiff commit any crime or violation of New York State Law.

2. The time when, the place where and the manner in which the civil complaint arose:

3. On or about December 23, 2016, at approximately 11:20 p.m., plaintiff was lawfully present in the vicinity of Decatur Street and Throop Avenue, in Brooklyn, New York. A verbal dispute-that plaintiff was not involved in- began between two other individuals. Soon thereafter NYPD officers arrived on the scene, accosted plaintiff, and immediately began to search him in the surrounding area. Thereafter, plaintiff was placed under arrest with his arms handcuffed tightly behind his back.

4. Subsequently, plaintiff was transported to a nearby precinct, questioned, subjected to an invasive strip search, fingerprinted, photographed, and charged with Criminal Possession of a Weapon, Menacing and Harrassment. At not time on December 23, 2016, did plaintiff possess a weapon, menace or harass any person, commit any crimes or offenses, or behave

unlawfully in any way. As a result of his unlawful arrest, plaintiff spent approximately thirty (30) hours in custody before he was released prior to criminal court arraignment on or about December 24, 2016, when the Kings County District Attorney's Office declined to prosecute the arrest. See EXhibit "A", Letter from District Attorney's Office dated 7/28/17.

5. The damages and injuries plaintiff claims are:

6. (A) False Arrest; (B) False imprisonment; (C) Negligent Supervision and retention; (D) Unlawful search and seizure; (E) Loss of Liberty; (F) Loss of Civil Rights; (G) 4th, 8th, and 14th Amendment violations of the United States Constitution; (H) Constitutional violations pursuant to 42 U.S.C. § 1983; (I) Intentional Infliction of Emotional Distress; (J) Negligent Infliction of Emotional Distress; (K) Negligence; (L) Assault; (M) Assault; (N) Battery; (O) Cruel and Reckless Infliction of Pain and Suffering.

**STATEMENT OF FACTS**

7. On or about December 23, 2016, in the County of Kings, New York, Police Officers and supervisors, including defendants P.O. POM SEDA, and SGT. ALTHAIBANI, at times acting in concert, and at times acting independently, committed the following Constitutional violations against plaintiff.

8. Plaintiff re-states paragraphs 1,2,3,4, and as if the same were fully set forth at length herein.

9. Soon thereafter, defendants P.O. POM SEDA and SGT. ALTHAIBANI, with numerous other NYPD officers arrived at the scene.

10. Without having any knowledge or information of facts that plaintiff was either involved in the dispute, or committing a crime, or an act thereof, defendant POM SEDA immediately accosted plaintiff and began to search him and the surrounding area.

11. Thereafter, P.O. POM SEDA, with the approval of SGT. ALTHAIBANI, handcuffed plaintiff, arrested him and transported him to the 79th Precinct.

12. At the 79th Precinct, defendants P.O. POM SEDA, and SGT. ALTHAIBANI, extensively questioned plaintiff about an alleged weapon found at the scene.

13. Plaintiff informed defendants P.O. POM SEDA and SGT. ALTHAIBANI, that plaintiff was not involved in the dispute that occurred on Decatur Street and Throop Avenue. Plaintiff also informed the defendants P.O. POM SEDA and SGT. ALTHAIBANI that he was not in possession of, not aware of, nor did he own any weapon found on the scene.

14. Regardless of having no probable cause to arrest, or to continue detaining plaintiff, defendants P.O. POM SEDA and SGT. ALTHAIBANI subjected plaintiff to an invasive strip search, finger printing, photographing, and charged plaintiff with Criminal Possession of a Weapon, Menacing, and Harassment. See Exhibit "B", N.Y.C.P.D. Report dated 12/23/16.

15. At no time on December 23, 2016, did plaintiff possess a weapon, menace or harass any person, commit and criminal offense, or behave unlawfully.

16. Plaintiff continued to inform defendants P.O. POM SEDA and SGT. ALTHAIBANI of his innocence to which defendants completely disregarded.

17. As a result of this unlawful arrest, plaintiff spent approximately thirty (30) hours in custody before he was released prior to criminal arraignment on or about December 24, 2016. The Kings County District Attorney's Office declined to prosecute the arrest. See, Exhibit "A."

18. The aforesaid events are not isolated incidents. Defendant THE CITY OF NEW YORK has been aware (from other lawsuits) that many of the NYPD officers are violating the Constitutional rights of New York City residents. See, Exhibit "C."

-5-

19. Despite such notices, defendant THE CITY OF NEW YORK has failed to take corrective action.

20. This failure caused the defendant P.O. POM SEDA and SGT. ALTHAIBANI in the present case to violate plaintiff's civil rights.

21. Despite such notice, of prior lawsuits, defendant THE CITY OF NEW YORK has failed to supervise the individual defendants.

22. At all times defendant THE NEW YORK CITY POLICE DEPARTMENT and it agents, servants and employees negligently, carelessly, failed to supervise and correct the reckless and wanton behavior of individual defendants, P.O. POM SEDA and SGT. ALTHAIBANI.

23. The occurrences and injuries sustained by plaintiff, were caused solely by, and as a result of the negligent, malicious, reckless, and wanton conduct of defendants THE CITY OF NEW YORK, THE NEW YORK CITY POLICE DEPARTMENT by failing to supervise and correct the reckless conduct of the individual defendants P.O. POM SEDA and SGT. ALTHAIBANI toward plaintiff.

24. The defendants P.O. POM SEDA and SGT. ALTHAIBANI did not observe plaintiff engage in suspicious, unlawful or criminal conduct at any time prior or during the date of the incident.

25. At no time prior, during or after the above named incident were the individual defendants P.O. POM SEDA and SGT. ALTHAIBANI provided with information, warrants, or a complaint from a third person, New York State Court, defendants THE CITY OF NEW YORK, nor THE NEW YORK CITY POLICE DEPARTMENT that stated plaintiff had engaged in prohibited, suspicious, unlawful or criminal conduct.

26. P.O. POM SEDA and SGT. ALTHAIBANI acted in concert and individually to commit the above described illegal acts towards plaintiff.

-6-

27. The defendants acted under the pretense and color of the State law and within the scope of their employment. Said acts by said defendants were beyond the scope of their jurisdiction, without authority of law, and in abuse of their powers, and said defendants acted willfully, knowingly, and with specific intent to deprive plaintiff of his constitutional rights.

## FIRST CLAIM
### (FALSE ARREST)

28. Plaintiff repeats and re-alleges all the foregoing paragraphs as if the same were fully set forth at length herein.

29. Defendants' accosted, searched, seized, and arrested plaintiff without any information that plaintiff had engaged or was a party thereto to criminal activity on December 23, 2016.

30. Accordingly, the defendants are liable to plaintiff pursuant to 42 U.S.C. § 1983, and all injuries described herein at paragraph 6.

31. As a direct result of the false arrest and actions, plaintiff experienced pain and suffering, loss of liberty, fear and invasion of privacy, psychological distress, emotional distress, great mental anguish, embarrassment, humiliation, his reputation character injured, earning power permanently impaired.

## SECOND CLAIM
### (FALSE IMPRISONMENT)

32. Plaintiff repeats and re-alleges all the foregoing paragraphs as if the same were fully set forth at length herein.

33. The defendants, without probable cause, confined the plaintiff while plaintiff was aware of said confinement and did not consent to being confined, while the confinement was not privileged.

34. Accordingly, the defendants are liable to plaintiff under New York State Laws for false imprisonment, in violation of plaintiff's Constitutional

rights under the 4th, 8th, and 14th Amendments of the United States Constitution.

## THIRD CLAIM

### (NEGLIGENT SUPERVISION, AND FAILURE TO TAKE CORRECTIVE ACTION OF EMPLOYEES)

35. Plaintiff repeats and re-alleges all the foregoing paragraphs as if the same were fully set forth at length herein.

36. Defendant THE CITY OF NEW YORK is liable to plaintiff because the occurrence and injuries sustained by plaintiff, were caused by, and as a result of the reckless and wanton conduct of THE NEW YORK CITY POLICE DEPARTMENT, its agents, servants, employees, defendants P.O. POM SEDA and SGT. ALTHAIBANI.

37. as to THE CITY OF NEW YORK, said claim and demand is hereby presented for adjustment and payment.

38. As a direct result of the negligent supervision, and failure to take corrective action of employees, plaintiff experienced pain and suffering, loss of liberty, fear and invasion of privacy, psychological distress, emotional distress, great mental anguish, embarrassment, humiliation, his reputation character injured, earning power permanently impaired.

## FOURTH CLAIM

### (INTENTIONAL AND NEGLIGENT INFLICTION OF EMOTIONAL, PSYCHOLOGICAL, GREAT MENTAL DISTRESS)

39. Plaintiff repeats and re-alleges all the foregoing paragraphs as if the same were fully set forth at length herein.

40. That by virtue of the occurrences of the defendants, individually and or by their agents intentionally inflicted intentional and negligent emotional, psychological, and great mental harm upon plaintiff.

41. The defendants caused reckless and wanton distress. Which violates plaintiff's 8th Amendment right to be free from cruel and unusual punishment.

-8-

42. As a direct result of the intentional and negligent infliction of emotional, psychological, and great mental anguish, plaintiff experienced pain and suffering, loss of liberty, fear and invasion of privacy, embarrassment, humiliation, his reputation character injured, earning power permanently impaired.

## FIFTH CLAIM

### (FAILURE TO INTERVENE)

43. Plaintiff repeats and re-alleges all the foregoing paragraphs as if the same were fully set forth at length herein.

44. Defendants THE CITY OF NEW YORK, and THE NEW YORK CITY POLICE DEPARTMENT had a reasonable opportunity to prevent the constitutional violations of plaintiff's rights, but they failed to intervene and correct the reckless and wanton behavior of defendants P.O. POM SEDA and SGT. ALTHAIBANI.

45. Accordingly, defendants THE CITY OF NEW YORK and THE NEW YORK CITY POLICE DEPARTMENT are liable to plaintiff for failure to intervene and correct the reckless and wanton behavior of P.O. POM SEDA and SGT. ALTHAIBANI against plaintiff.

46. As a direct result of the failure to intervene, plaintiff experienced pain and suffering, loss of liberty, fear and invasion of privacy, psychological distress, emotional distress, great mental anguish, embarrassment, humiliation, his reputation character injured, earning power permanently impaired.

## SIXTH CLAIM

### (MONELL CLAIM)

47. Plaintiff repeats and re-alleges all the foregoing paragraphs as if the same were fully set forth at length herein.

48. Defendant THE CITY OF NEW YORK, through its policies, practices and customs, directly caused the constitutional violations suffered by plaintiff.

49. Defendant THE NEW YORK CITY POLICE DEPARTMENT, were aware that defendants P.O. POM SEDA and SGT. ALTHAIBANI violated plaintiff's constitutional rights, and failed to correct the reckless behavior of said defendants.

50. Defendants P.O. POM SEDA and SGT. ALTHAIBANI exercised reckless and wanton, and negligent conduct against plaintiff. Defendants are liable for Monell liability due to their unprofessional practices conducted on 12/23/16. Furthermore, defendants THE CITY OF NEW YORK and THE NEW YORK CITY POLICE DEPARTMENT liable under Monell due to their knowledge of past behavior and conduct of staff and officers. See, Exhibit "C."

51. As a direct result of all defendants' errors, reckless, wanton, and failure to supervise and correct illegal conduct, plaintiff experienced pain and suffering, loss of liberty, fear and invasion of privacy, psychological distress, emotional distress, great mental anguish, embarrassment, humiliation, his reputation character injured, and earning power permanently impaired.

WHEREFORE, plaintiff requests a jury trial and the following relief jointly and severally against the defendants: Compensatory damages in an amount to be determined by a jury, Punitive damage in an amount to be determined by a jury; Costs, interest and attorney's fees, pursuant to 42 U.S.C. § 1988; Plaintiff seeks compensatory damages from his pain and suffering, loss of liberty, fear and invasion of privacy, psychological distress, emotional distress, great mental anguish, embarrassment, humiliation, his reputation character injured, and earning power permanently impaired from each defendant individually and official capacity in the amount of $500,000.00 USD. For a subtotal of Five Hundred Thousand Dollars ($500,000.00 USD). and for further sanctions this court deems just and proper.

-10-

I declare under penalty and perjury that on _APRil 17, 2019_ , I delivered this complaint to prison authorities at _RiVERViEW CORRECTiONAL FACiLiTY_

to be mailed to the United States District Court for the Eastern District of New York.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: _APRil 17, 2019_
Ogdensburg, New York

_Willie Brown_
Signature of Plaintiff

Willie Brown, DIN# 17R1884
Riverview Correctional Facility
P.O. Box 247
Ogdensburg, New York 13669

-11-

EXHIBITS-A



**DISTRICT ATTORNEY**
KINGS COUNTY
350 JAY STREET
BROOKLYN, NY 11201-2908
(718) 250-2000
WWW.BROOKLYNDA.ORG

**Eric Gonzalez**
Acting District Attorney

July 28, 2017

Ilyssa Fuchs, Esq.
Cohen & Fitch, LLP
The Woolworth Building
233 Broadway, Suite 1800
New York, NY 10279

Re:   <u>**Brown, Willie**</u>
      <u>**Arrest No. K16690675**</u>

Dear Ms. Fuchs:

This letter is in response to your request for information regarding the above-referenced arrest of **December 23, 2016.**

Please be advised that a review of the records of the Kings County District Attorney's Office indicate that a prosecution arising out of this arrest has been declined.

Sincerely,

Anne Gutmann
Bureau Chief
Early Case Assessment Bureau
(718) 250-3500

AG:nt

EXHIBITS-B



# New York City Police Department
## Omniform System - Arrests

**RECORD CONTAINS SEALED INFORMATION.**
THIS RECORD MAY NOT BE MADE AVAILABLE TO ANY PERSON
OR PUBLIC OR PRIVATE AGENCY OUTSIDE THE POLICE DEPARTMENT.

| *RECORD STATUS: SEALED* | **Arrest ID:** K16690675 - R |
|---|---|

| **Arrest Location: SOUTH WEST CORNER DECATUR STREET & THROOP AVENUE** | **Pct: 079** |
|---|---|

**Arrest Date:** 12-23-2016  Processing Type: ON LINE  Current Location of Perpetrator:
**Time: 23:20:00**  DCJS Fax Number: KO065784  Borough: Brooklyn
Sector: A  Special Event Code: NO -  Type:
Strip Search Conducted: NO  DAT Number: 0  Location: 079 PRECINCT
Viper Initiated Arrest: NO
Stop And Frisk: NO  Return Date: 0000-00-00
Serial #: 0000-000-00000

**COMPLAINTS:**  Arrest #: K16690675

| COMPLAINT NUMBER | REPORT DATE | RECORD STATUS | OCCUR DATE | OCCUR TIME |
|---|---|---|---|---|
| 2016-079-08799 | 2016-12-23 | Valid, Initial Arrests made | 2016-12-23 | 22:25 |

SEALED  SEALED

**CHARGES:**  Arrest #: K16690675

| CHARGE | ATTEMPT? | LAW CODE | CLASS | TYPE | COUNTS | DESCRIPTION |
|---|---|---|---|---|---|---|
| TOP | No | PL 265.03 01B | F | C | 1 | CPW-2ND: LOADED FIREARM |
| #02 | No | PL 265.02 03 | F | D | 1 | CRIM POSS WEAP-3RD:DEFACE WEAP |
| #03 | No | PL 120.14 01 | M | A | 1 | MENACING-2ND:WEAPON |

| DWI Arrest from: | # Injured: 00 | # Fatalities: 00 | Test Given: | B.A.C: | Reason Not Forfeit: |
|---|---|---|---|---|---|

SEALED  SEALED

**DETAILS:**  Arrest #: K16690675

AT TPO ███ STATE THAT BOTH DEFTS. APPROACH CV AND WITNESS AND STARTED ARGUING, TOLD CV "YOU TALKING CRAZY RIGHT NOW, AND YOU BITCHES ACTING CRAZY" DEFTS THEN THREW WATER AT CV DEFT. #1 WEARING ORANGE JACKET THEN STATED "DO YOU WANNA GET SHOT" AND PULLED A FIREARM OUT OF HIS BACKPACK. AT WHICH POINT DEFT#2 GRABBED THE BAG FROM DEFT#1 AND FLED LOCATION. BOTH DEFT'S STOPPED C/O DECATUR AND THROOP POSITIVE SHOW UP. SGT. ALTHAIBANI ON SCENE.

SEALED  SEALED

**DEFENDANT: BROWN, WILLIE**  NYSID #: 09715907N  Arrest #: K16690675

| | | |
|---|---|---|
| Nick/AKA/Maiden: | Height: 5FT 7IN | Order Of Protection: NO |
| Sex: MALE | Weight: 130 | Issuing Court: |
| Race: BLACK | Eye Color: BROWN | Docket #: |
| Age: 33 | Hair Color: UNKNWN | Expiration Date: |
| Date Of Birth: 03/18/1983 | Hair Length: BALD | Relation to Victim: STRANGER |
| U.S. Citizen: YES | Hair Style: BALD | Living together: NO |
| Place Of Birth: UNKNOWN | Skin Tone: MEDIUM | Can be Identified: YES |
| NO | Complexion: CLEAR | |

Is this person not Proficient in English?:

If Yes, Indicate Language:

Accent: NO

Soc.Security #:

Occupation: UNKNOWN

Gang/Crew Affiliation: NO

Name:

Identifiers:

Identification ID: NYS Drivers License or Permit

Identification #: 242959102

Physical Condition: APPARENTLY NORMAL

Lic/Permit Type:

Lic/Permit No:

Drug Used: NONE

| LOCATION | ADDRESS | CITY | STATE/CNTRY | ZIP | APT/ROOM | PCT |
|----------|---------|------|-------------|-----|----------|-----|
| HOME-PERMANENT | 190 MARCY AVENUE | BROOKLYN | NEW YORK | 11211 | 16E | 090 |

Phone # and E-Mail Address: CELL: 347-867-2256

N.Y.C.H.A. Resident: YES       N.Y.C. Housing Employee: NO  On Duty: NO

Development: WILLIAMS PLAZA   N.Y.C. Transit Employee: NO

Physical Force: NONE

Gun: HANDGUN

Weapon Used/Possessed: USED/DISPLAYED        Make: DAN WESSON            Recovered: YES

Non-Firearm Weapon:                          Color: BLACK      Serial Number Defaced: YES

Other Weapon Description:                     Caliber: .357 CAL            Serial Number:

                                             Type: PISTOL, REVOLVER

                                       Discharged: NO

Used Transit System: NO

Station Entered:

Time Entered:

Metro Card Type:

Metro Card Used/Poses:

Card #:

| CRIME DATA | DETAILS |
|------------|---------|
| STATEMENTS MADE | DO YOU WANNA GET SHOT |
| METHOD OF FLIGHT | ARRESTED |
| MODUS OPERANDI | PERP MADE STATEMENT |
| ACTIONS TOWARD VICTIM | THREATENED |
| CLOTHING | HEADGEAR - BASEBALL HAT - GRAY |
| CLOTHING | OUTERWEAR - SNORKEL, SKI, HOODED JACKET - BLACK |
| CLOTHING | ACCESSORIES - JEANS - BLACK |
| CLOTHING | FOOTWEAR - SNEAKERS - MULTI COLORED OR STR |
| CHARACTERISTICS | UNKNOWN |
| BODY MARKS | TORSO -TATTOO WITH PICTURE ONLY - DESCRIBE:LETTERS ON CHEST |
| IMPERSONATION | UNKNOWN |

SEALED                                                              SEALED

JUVENILE DATA:                                      Arrest #: K16690675

Juvenile Offender:   Relative Notified:  Personal Recog:

Number Of Priors: 0        Name:

School Attending:    Phone Called:

Mother's Maiden Name:    Time Notified:

SEALED                                                              SEALED

ASSOCIATED ARRESTS:                               Arrest #: K16690675

ARREST ID  COMPLAINT #

| ███████████████ | |
|---|---|
| SEALED | SEALED |

| No Vehicles for Arrest # | |
|---|---|
| SEALED | SEALED |

**DEFENDANTS CALLS:**                                          Arrest #: K16690675

| CALL # | NUMBER DIALED | NAME - PROVIDED BY DEFENDANT | NAME AS LISTED IN CELL PHONE | RELATIONSHIP | CALL COMPLETED |
|---|---|---|---|---|---|
| 1 | ████████ | ████████ | ████ | ████ | ██ |

| SEALED | SEALED |
|---|---|

**INVOICES:**                                          Arrest #: K16690675

| INVOICE# | COMMAND | PROPERTY TYPE | VALUE |
|---|---|---|---|
| 3000757945 | 079 | FIREARMS | UNKNOWN |

| SEALED | SEALED |
|---|---|

**ARRESTING OFFICER:** ████████ SEDA                Arrest #: K16690675

| Tax Numbe | On Duty: YES | **Force Used:** NO |
|---|---|---|
| Other ID (non-NYPD█ | In Uniform: NO | Type: |
| Shield | Squad: AC | Reason: |
| Department: NYPD | Chart: 99 | Officer Injured: NO |
| Command: 079 | Primary Assignment: | |

| SEALED | SEALED |
|---|---|

| Arresting Officer Name:<br>POM SEDA, ██████ | Tax #:<br>████ | Command:<br>079 | Agency:<br>NYPD |
|---|---|---|---|
| Supervisor Approving:<br>SGT ALTHAIBANI ████ | Tax #:<br>████ | Command:<br>088 | Agency:<br>NYPD |
| Report Entered by:<br>POM SEDA, ██████ | Tax #:<br>████ | Command:<br>079 | Agency:<br>NYPD |

**END OF ARREST REPORT**
K16690675

EXHIBITS-C.

WESTLAW

**Smalls v. City of New York**
United States District Court, E.D. New York.    March 18, 2019    Slip Copy    2019 WL 1243823    (Approx. 10 pages)

2019 WL 1243823
Only the Westlaw citation is currently available.
United States District Court, E.D. New York.

Elliott SMALLS, Plaintiff,

v.

CITY OF NEW YORK; P.O. Ngai; and NYC Police Officers John Doe 1–4,
Defendants.

15-CV-3017 (RRM) (RLM)
Signed 03/18/2019

**Attorneys and Law Firms**

Elliott Smalls, Brooklyn, NY, pro se.

John Raymond Mechmann, III, New York City Law Department, New York, NY, Nana
Kwame Sarpong, Wilson Elser, Florham Park, NJ, for Defendants.

<u>**MEMORANDUM & ORDER**</u>

ROSLYNN R. MAUSKOPF, United States District Judge

*1 Plaintiff Elliott Smalls brings this action against defendants City of New York (the "City"),
Police Officer Ngai ("Officer Ngai"), and four John Doe police officers, alleging claims
pursuant to 42 U.S.C. § 1983 for violations of his constitutional rights arising from a 2014
arrest. Before the Court are the City's motion to dismiss the claims against Officer Ngai for
insufficient service of process, the City's motion for judgment on the pleadings with respect
to Smalls' claim against the City, Smalls' second motion for leave to amend his complaint,
and Smalls' request for an extension of time to serve Officer Ngai and the John Doe officers.
(Def. Mem. (Doc. No. 45); Pl. Opp'n (Doc. No. 42).) For the reasons set forth below, the
claims against Officer Ngai are dismissed pursuant to Federal Rule of Civil Procedure
("Rule") 4(m), the City's motion for judgment on the pleadings is granted in part and denied
in part, and Smalls' motion for leave to amend and request for extension of time are both
denied.

**BACKGROUND**

Smalls, represented by counsel, filed the original complaint in this action on May 22, 2015.
(Compl. (Doc. No.1).) As relevant here, the complaint alleged a number of state and federal
causes of action against the City, Officer Ngai, and the John Doe officers. (*Id.* ¶¶ 40–117.)
For the next eight months, Smalls did not file anything with the Court, and he did not serve
either of the two named defendants.

On February 16, 2016, without seeking leave to amend, Smalls filed an amended complaint
– now the operative pleading – which omitted the state claims and added new allegations in
support of his § 1983 claim against the City. (Am. Compl. (Doc. No. 5).) The only specific
factual allegations in the amended complaint relate to a single encounter between Smalls
and officers from the New York Police Department ("NYPD") on the night of May 22, 2014.
On that date, Smalls alleges that he and his son unsuccessfully attempted to gain access to
the apartment where his son was residing along with the son's mother, Winifred Mackins
("Mackins"). (*Id.* ¶¶ 13–17.) The apartment was located in a Brooklyn public housing
complex managed by the New York City Housing Authority ("NYCHA"). (*Id.* ¶¶ 13, 15.) Upon
arrival at the apartment, Smalls and his son discovered the door chained from the inside,
and they were unable to draw the attention of Mackins or anyone else inside. (*Id.* ¶¶ 18–19.)
Concerned, they went to the building lobby and contacted the housing police. (*Id.* ¶ 20.)
Shortly thereafter, five or six NYPD officers arrived and began to question Smalls and his
son. (*Id.* ¶ 21.) With the consent of Smalls' son, the four officers identified as John Does in
the amended complaint went to the apartment themselves and were met at the door by
Mackins, who reported that she had been sleeping. (*Id.* ¶¶ 22–23.)

According to Smalls, the four officers then returned to the lobby and began to verbally abuse
him. (*Id.* ¶¶ 24–29, 54.) He alleges one of the officers "berated [him] for trespassing and not
being on the lease" and subjected to him to a "tirade" lasting several minutes. (*Id.* ¶¶ 26–27.)

He claims that, when he protested, another officer "slammed [him] against the wall and then down to the floor," causing him to become short of breath and causing his arm to emit a "sickening 'crack.' " (*Id.* ¶¶ 28–29.) Smalls is an asthmatic who carries an inhaler, and he alleges that the officers refused to allow him to access his inhaler after he became short of breath. (*Id.* ¶ 29.) Instead, he says, they handcuffed him and transported him first to a medical center, where he was diagnosed with a fractured elbow, and then to the local precinct, where Officer Ngai photographed him and issued him a ticket for criminal trespass in the third degree. (*Id.* ¶¶ 30–32.) Smalls does not allege that Officer Ngai was involved in the night's events in any other respect. (*Id.* ¶ 32.)

**\*2** After receiving the ticket, Smalls was released. (*Id.* ¶ 33.) Several months later, the county district attorney declined to prosecute his case. (*Id.* ¶ 34.) However, according to Smalls, the injury to his elbow has lingered and continues to cause debilitating pain. (*Id.* at 35–36.)

In the amended complaint, Smalls asserts a variety of § 1983 claims against the City, Officer Ngai, and the John Doe officers. With respect to the City, Smalls alleges that "[t]he acts complained of were carried out by the aforementioned individual defendants ... pursuant to the[ ] customs, usages, practices, procedures, and the rules of the City of New York and the New York City Police Department, all under supervision of said department." (*Id.* ¶ 42; *see also id.* ¶¶ 43, 46, 72.) Smalls alleges that the "aforementioned customs, policies, usages, practices, procedures, and rules" include the following unconstitutional practices:

   a. wrongfully arresting individuals engaged in first amendment protected expression without probab[le] cause due to perceived lack of respect for the police officer ... i.e., "contempt of cop" arrests ...;

   b. wrongfully arresting individuals engaged in first amendment protected expression without probable cause in attempts to justify excessive uses of force against the same ... i.e. "contempt of cop," "cover charge" arrests; ...

   c. [t]he pervasive failure to train, supervise, instruct and discipline police officers with respect to the constitutional rights of citizens, and encouraging the ensuing misconduct through condoning officers' widespread custom or practice known as "the Blue Wall of Silence," wherein officers deliberately frustrate official and departmental oversight by discouraging officers from reporting violent and unlawful acts of other police officers, and by retaliating against officers who report police misconduct;

   d. [t]he policy of unlawfully detaining and arresting NYCHA residents and their guest[s] for the purported offense of trespassing, despite no probable cause that a crime had occurred [; and]

   e. [d]espite numerous lawsuits, the NYPD has continued its unconstitutional programs of stairwell patrols, ticketing residents for 'lingering' in lobbies, halls and stairwells, and arresting visitors for trespassing, all amounting to a policy of unlawful racial profiling.

(*Id.* ¶ 73.)

Following this last entry, the amended complaint includes a citation to a 2014 article published in the New York Times entitled "Police Patrols in New York Public Housing Draw Scrutiny." (*Id.* at 13 n.1); J. David Goodman, *Police Patrols in New York Public Housing Draw Scrutiny*, N.Y. TIMES (Dec. 15, 2014), https://www.nytimes.com/2014/12/16/nyregion/amid-calls-for-police-reform-little-scrutiny-of-public-housing-patrols.html (hereinafter Goodman, *Police Patrols* ). The article describes, among other things, "a routine patrol tactic used by the [NYPD]" of commencing stops on NYCHA property in order to enforce NYCHA rules. According to the article, these stops often mature into "arrests for trespassing on public housing grounds." Goodman, *Police Patrols, supra*. The article notes that, as of its publication date in 2014, these arrests were the subject of a federal lawsuit against the NYPD. *Id.*

One day after Smalls filed the amended complaint, the Honorable Chief Magistrate Judge Roanne L. Mann ordered Smalls to show cause "why the case should not be dismissed with prejudice for lack of prosecution ... or dismissed for failure to serve defendants with the summons and complaint within 120 days, pursuant to Rule 4(m)." (Order to Show Cause (Doc. No. 6) at 1.)[1] Several days later, Smalls' attorney responded by letter. In the letter, his attorney acknowledged his failure to serve the parties within 120 days of the filing of the complaint, which he described as an "embarrassing oversight ... due to counsel's belief that the complaint had been given to a process server" and due to him "thereafter simply los[ing]

track of the case." (Feb. 22, 2016 Letter (Doc. No. 7) at 1.) He argued that the court should not dismiss the case. In particular, with respect to Rule 4(m), he argued that "notice to the plaintiff must be given prior to a *sua sponte* dismissal," and that Chief Magistrate Judge Mann's order to show cause was the first such notice Smalls received. (*Id.* at 3–4.) Accordingly, he moved the court for leave to file the amended complaint *nunc pro tunc* and to serve the defendants within fourteen days thereafter. (*Id.* at 1.)

*3 On March 8, 2016, Chief Magistrate Judge Mann granted the motion, deemed the previously filed amended complaint the operative pleading, and directed Smalls to effect service by March 22, 2016. (Mar. 8, 2016 Mem. & Order (Doc. No. 8) at 2.) That same day, Smalls' attorney filed an affidavit of service stating that he had served the City with the summons and amended complaint at 100 Church Street in Manhattan – a building that houses, among other things, the City's Office of the Corporation Counsel. (Aff. of Service (Doc. No. 9) at 1.) He did not file an affidavit of service with respect to Officer Ngai by March 22 or at any time thereafter.

For the next 10 months, the litigation proceeded with only the City having entered an appearance. The City answered the amended complaint, (Answer (Doc. No. 12) ), and the parties held an unsuccessful settlement conference, (Jan. 17, 2017 Min. Entry (Doc. No. 18) at 1). Notably, during this period, on July 7, 2016, Smalls received an initial disclosure which, according to the City, "identified the individuals believed to be the John Doe officers." (Def. Mem. at 9; Sarpong Decl., Ex. G (Doc. No 46-7) at 2–3.) Referencing this disclosure, Chief Magistrate Judge Mann noted that "automatic disclosures have been exchanged" and "pleadings may be amended and new parties added until August 22, 2016." (July 7, 2017 Min. Entry (Doc. No 14) at 1.) Smalls, however, never moved to amend his complaint to identify the four John Doe officers.

In early 2017, Smalls' attorney ceased to represent him. On February 6, 2017, the attorney petitioned the court, *ex parte*, to appoint Deborah Smalls, plaintiff's sister, as a guardian *ad litem*. (Pet. (Doc. No. 22).) Approximately one month later, unable to obtain consent from Deborah Smalls to act as guardian and citing his own irreconcilable differences with Smalls, the attorney moved to withdraw from the representation. (Mot. to Withdraw (Doc. No. 25) at 1.) On March 30, Chief Magistrate Judge Mann granted the attorney's motion. (Mar. 30, 2017 Min. Entry (Doc. No. 30).) Since then, Smalls has proceeded *pro se*.

Over the summer of 2017, Chief Magistrate Judge Mann reopened discovery and held another unsuccessful settlement conference. (July 14, 2017 Min. Entry (Doc No. 34).) The parties proceeded to brief the instant motions, which were filed earlier this year. Prior to the filing of the City's motion for dismissal of the case against Officer Ngai, the City never indicated in its filings that it sought to represent the interests of any individual officer, and the attorney for the City has not entered an appearance on any officer's behalf. Instead, in every filing up to and including the instant motions, the Corporation Counsel has stated that it represents "defendant City of New York." (*See, e.g.*, Answer at 1; Mot. for Extension of Time (Doc. No. 10) at 1; Aug. 11, 2017 Letter (Doc. No. 35) at 1; Def. Mem. at 7.) Meanwhile, between Smalls' attorney's February 22, 2016, letter and the filing of the instant motions over two years later, Smalls did not seek to amend his complaint in order to identify the four John Doe officers, nor did he request any extensions of time to effect service on those defendants or on Officer Ngai.

## DISCUSSION

### I. Claims Against Officer Ngai

Rule 4(m) provides that, "[i]f a defendant is not served within 90 days after the complaint is filed, the court—on motion or on its own after notice to the plaintiff—must dismiss the action without prejudice against that defendant or order that service be made within a specified time." "[I]f the plaintiff shows good cause for the failure," however, "the court must extend the time for service for an appropriate period." *Id.* In general, good cause means at least "some colorable excuse" for the failure. *Meilleur v. Strong*, 682 F.3d 56, 61 (2d Cir. 2012) (quoting *Zapata v. City of New York*, 502 F.3d 192, 198 (2d Cir. 2007) ). "Good cause is generally found only in exceptional circumstances where the plaintiff's failure to serve process in a timely manner was the result of circumstances beyond [his] control." *Jordan v. Forfeiture Support Assocs.*, 928 F. Supp. 2d 588, 597–98 (E.D.N.Y. 2013) (quoting *Beauvoir v. U.S. Secret Serv.*, 234 F.R.D. 55, 56 (E.D.N.Y. 2006) ).

*4 Applying these principles to plaintiffs represented by counsel, the Second Circuit has explained that "[a]ttorney error does not constitute good cause." *Counter Terrorist Grp. U.S. v. N.Y. Magazine*, 374 F. App'x 233, 235 (2d Cir. 2010) (summary order) (citing *McGregor v.*

United States, 933 F.2d 156, 159–60 (2d Cir. 1991) ); see also Harper v. City of New York,
No. 09-CV-5571 (JG) (SMG), 2010 WL 4788016, at *6 (E.D.N.Y. Nov. 17, 2010) (citation
omitted) ("Only counsel's oversight or disregard of Rule 4's requirements can explain
[plaintiff's] failure to serve [defendant]. Neither constitutes good cause within the meaning of
Rule 4(m)."), aff'd, 424 F. App'x 36 (2d Cir. 2011). Even the narrowest miscalculations or
mistakes by counsel, however honest, are not a basis for an extension of time. See, e.g.,
Counter Terrorist Grp. U.S., 374 F. App'x at 235 (attorney miscalculated the period to effect
service "by several days").

Similarly, with respect to pro se plaintiffs, neither mistake nor plain ignorance constitutes
good cause. See, e.g., Jordan, 928 F. Supp. 2d at 598 (noting that a plaintiff's pro se status
alone "is no excuse for failure to serve the defendant properly and does not automatically
amount to good cause for failure to serve within the time allotted by Rule 4(m)" (citation
omitted) ). "[I]gnorance or confusion, even in the case of a pro se plaintiff, do not constitute
good cause." Cassano v. Altshuler, 186 F. Supp. 3d 318, 322 (S.D.N.Y. 2016) (citing Ladner
v. Proportional Count Assocs., Inc., No. 96-CV-2190 (ILG), 2001 WL 1328443, at *2
(E.D.N.Y. Sept. 17, 2001) ).

In this case, the parties agree that neither Officer Ngai nor any of the John Doe officers has
been served. (Def. Mem. at 10; Pl. Opp'n at 1–2.) Although Smalls did eventually serve the
City, this "was not adequate to serve the individual officers." Carl v. City of Yonkers, No. 04-
CV-7031 (SCR), 2008 WL 5272722, at *4 (S.D.N.Y. Dec. 18, 2008) (holding that service at
the Corporation Counsel's office does not constitute service on individual officers), aff'd, 348
F. App'x 599 (2d Cir. 2009). See generally Fed. R. Civ. P. 4(e) (setting out the permissible
methods of service upon individuals within the United States).

As for the notice required before a dismissal pursuant to Rule 4(m), Smalls has already
received it. Over two years ago, Chief Magistrate Judge Mann ordered him to show cause
why he had failed to effect service on Officer Ngai and the other defendants. (Order to Show
Cause at 1.) His attorney at the time acknowledged that this constituted the notice required
by Rule 4(m). (Feb. 22, 2016 Letter at 1.) Nevertheless, neither the attorney nor Smalls, later
representing himself pro se, has since attempted to serve Officer Ngai.

While this failure could be excused upon a showing of good cause, Smalls does not make
any such showing. In his opposition, he argues only that he relied on his attorney, who
should have known to effect service. (Pl. Opp'n at 1.) In this, Smalls is correct. His attorney's
actions were ill-considered: for over nine months after filing the complaint, no defendants
were served. Only after prodding from Chief Magistrate Judge Mann did his attorney
recognize this problem, which he characterized as an "embarrassing oversight." (Feb. 22,
2016 Letter at 1.) But even then, he only served the City. (Aff. of Service at 1.) The attorney
continued to represent Smalls for another year, participating in discovery and settlement
negotiations. (See Jan. 17, 2017 Min. Entry at 1.) In July, the attorney received disclosures
that the City claims included the names of the John Doe officers. (Sarpong Decl., Ex. G at 2
–3.) Throughout all of this, over the course of 22 months, the attorney never sought to
amend the complaint to identify the John Doe officers, and he never effected service on any
of the defendant officers, including Officer Ngai.

*5 As unfortunate as this all may be for Smalls, though, such "[a]ttorney error does not
constitute good cause." Counter Terrorist Grp. U.S., 374 F. App'x at 235. Nor, although he
does not point to it, does Smalls' current pro se status change the calculus. See, e.g.,
Jordan, 928 F. Supp. 2d at 598. Interpreting the record favorably to Smalls, the most it
indicates is that a combination of attorney error and his own ignorance are the reasons for
the continued failure of service. The law is clear that neither one establishes good cause.
See Counter Terrorist Grp. U.S., 374 F. App'x at 235; Cassano, 186 F. Supp. 3d at 322
(holding pro se ignorance does not constitute good cause).

This is not the end of the matter, as "[a] district court also 'has discretion to enlarge the 120-
day period for service, even in the absence of good cause.' " Frederick v. City of New York,
No. 13-CV-897 (MKB), 2016 WL 8711395, at *6–8 (E.D.N.Y. Mar. 25, 2016) (quoting
Frankenberger v. Firth Rixson, Inc., 565 F. App'x 37, 38 (2d Cir. 2014) ); see also Zapata,
502 F.3d at 196. In determining whether a discretionary extension is appropriate in the
absence of good cause, courts in this Circuit generally consider the equities between the
parties. See, e.g., Mares v. United States, 627 F. App'x 21, 23 (2d Cir. 2015) (summary
order); Vaher v. Town of Orangetown, 916 F. Supp. 2d 404, 420 (S.D.N.Y. 2013). Factors
relevant to this analysis include "(1) whether any applicable statutes of limitations would bar
the action once re-filed; (2) whether the defendant[s] had actual notice of the claims
asserted in the complaint; (3) whether defendant[s] attempted to conceal the defect in

service; and (4) whether defendant[s] would be prejudiced by extending plaintiff's time for service." *Vaher,* 916 F. Supp. 2d at 420 (quoting *DeLuca v. AccessIT Grp., Inc.,* 695 F. Supp. 2d 54, 66 (S.D.N.Y. 2010) ).

Additionally, courts consider whether, even though plaintiff cannot show good cause, there is any "cognizable excuse for the delay." *Zapata,* 502 F.3d at 199. Prolonged attorney neglect is not such an excuse. *See, e.g., id.* (upholding the district court's refusal to extend time where the represented plaintiff "made no effort to effect service within the service period" and "neglected to ask for an extension within a reasonable period of time"); *Harper,* 2010 WL 4788016, at *6 ("After considering the equities, I see no reason to [extend the period for service] where the need for the extension results entirely from counsel's neglect and the request for it came only after the time for service expired, in response to a motion to dismiss."); *see also Carl,* 2008 WL 5272722, at *7. Moreover, a failure to offer a cognizable excuse can be dispositive. "[T]he Second Circuit has stated clearly that even if the balance of hardships favors the plaintiff a district court may still decline to excuse a failure to timely serve the summons and complaint where the plaintiff fails to advance some colorable excuse for neglect." *Vaher,* 916 F. Supp. 2d at 420–21 (citing *Zapata,* 502 F.3d at 198 & n.7; *Bogle–Assegai v. Connecticut,* 470 F.3d 498, 509 (2d Cir. 2006) ).

In this case, Smalls does not point to any cognizable excuse for his failure to effect service beyond his attorney's neglect. As already explained at length, his attorney had ample time to serve Officer Ngai during the 22 months when he represented Smalls, but he did not. As the attorney himself admitted, his failure during the first nine-plus months of this period was due to an "embarrassing oversight." (Feb. 22, 2016 Letter at 1.)

*6 The record does not reveal what, if anything, Smalls' attorney shared with Smalls upon the termination of his representation, but it appears that Smalls was not aware of the defect in service until the instant motions were filed. (*See* Pl. Opp'n at 1–2.) This accounts for another year without service, and it, too, is attributable to his attorney's neglect. Smalls' ignorance as a *pro se* plaintiff was also undoubtedly a factor, but this alone is not enough of an excuse to overcome the weight of his attorney's errors. *See Carl,* 2008 WL 5272722, at *7 (plaintiff's inability to effect service while *pro se* "is counterbalanced by the fact that ... while represented by counsel, [plaintiff] made no further effort to serve the individual defendants or to ascertain their status in the case").

Certainly, neither the Court nor the defendants shares any responsibility for the delay: Chief Magistrate Judge Mann reminded Smalls' attorney of his service obligations in February 2016, and there is no evidence that any of the defendants sought to conceal the continuing defect in service. *See Vaher,* 916 F. Supp. 2d at 420 (in balancing the equities, considering whether defendants concealed defective service). In the nine months before the City was served, there was nothing for defendants to conceal, as there is no evidence any of them knew of the case's existence. (Feb. 22, 2016 Letter at 1.) After the City was served, and up to and including present motion practice, it never once purported to represent the interests of Officer Ngai or any other officer. In all of its court filings, Corporation Counsel clearly identified itself as representing "defendant City of New York." (*See, e.g.,* Answer at 1; Mot. for Extension of Time at 1.)

Consideration of the balance of hardships does not change this analysis. Smalls and Officer Ngai both stand to be meaningfully prejudiced by an adverse result. For Smalls, the statute of limitations on all of his claims has long since expired. *Cf. De La Rosa v. N.Y.C. 33 Precinct,* No. 07-CV-7577 (PKC) (KNF), 2010 WL 1737108, at *7 (S.D.N.Y. Apr. 27, 2010) ("With respect to the first factor, courts often consider the fact that the statute of limitations has run on a claim as favoring the plaintiff."). "A Section 1983 claim ordinarily 'accrues when the plaintiff knows or has reason to know of the harm.' " *Shomo v. City of New York,* 579 F.3d 176, 181 (2d Cir. 2009) (quoting *Eagleston v. Guido,* 41 F.3d 865, 871 (2d Cir. 1994) ). The statute of limitations on all of Smalls' § 1983 claims, other than that for malicious prosecution, began to run on May 22, 2014, when the events giving rise to those claims occurred. (Compl.) The statute of limitations on his malicious prosecution claim began to run when the district attorney declined to prosecute him on August 23, 2014. *See Spak v. Phillips,* 857 F.3d 458, 462 (2d Cir. 2017) ("In malicious prosecution suits under Section 1983, the statute of limitations begins to run when the prosecution terminate[s] in the plaintiff's favor." (internal quotation marks omitted) (citations omitted) ). "Section 1983 actions filed in New York are ... subject to a three-year statute of limitations." *Hogan v. Fischer,* 738 F.3d 509, 517 (2d Cir. 2013). Therefore, the statute of limitations for all but one of Smalls' claims expired on May 22, 2017, and the statute of limitations for the malicious

prosecution claim expired on August 23, 2017. Dismissal of these claims at this juncture will effectively bar recovery against Officer Ngai.

If the time for service is extended, however, Officer Ngai could find himself in litigation over events alleged to have occurred over four years ago. (Def.'s Mem. at 17.) "It is obvious that any defendant would be harmed by a generous extension of the service period beyond the limitations period for the action...." *Zapata*, 502 F.3d at 198.

*7 Whether or not time is extended, one party will suffer prejudice. But only Smalls and his attorney are responsible for creating this predicament, and "no weighing of the prejudices between the two parties can ignore that the situation is the result of the plaintiff's neglect." *Zapata*, 502 F.3d at 198. Accordingly, this Court declines to exercise its discretion to grant a second extension of time to serve Officer Ngai. Smalls had 120 days when he initiated the suit. He had another 186 days after Chief Magistrate Judge Mann granted a first extension in March 2016. (Mar. 8, 2016 Mem. & Order.) He will not now be given another extension, amounting to well over 1,000 days beyond the period for service contemplated by the Federal Rules. His claims against Officer Ngai are dismissed without prejudice pursuant to Rule 4(m).

**II. The City's Motion for Judgment on the Pleadings**
With respect to the remaining claims, the City moves for judgment on the pleadings pursuant to Rule 12(c). "In deciding a Rule 12(c) motion, we apply the same standard as that applicable to a motion under Rule 12(b)(6), accepting the allegations contained in the complaint as true and drawing all reasonable inferences in favor of the nonmoving party." *Alcantara v. Bakery & Confectionery Union & Indus. Int'l Pension Fund Pension Plan*, 751 F.3d 71, 75 (2d Cir. 2014) (quoting *Ziemba v. Wezner*, 366 F.3d 161, 163 (2d Cir. 2004) ). As in the 12(b) context, the inquiry is whether the complaint "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007) ); *see also Long v. Parry*, 679 F. App'x 60, 63 (2d Cir. 2017) (summary order).

A municipality is liable under § 1983 only if it "itself 'subjects' a person to a deprivation of rights or 'causes' a person to be subjected to such deprivation." *Connick v. Thompson*, 563 U.S. 51, 60 (2011) (citing *Monell v. N.Y.C. Dep't of Soc. Servs.*, 436 U.S. 658, 692 (1978) ); *see also City of Canton v. Harris*, 489 U.S. 378, 385 (1989); *Cash v. Cty. of Erie*, 654 F.3d 324, 333 (2d Cir. 2011). In other words, municipalities are liable only for "their own illegal acts" – they are not vicariously liable for the actions of their employees. *Pembaur v. Cincinnati*, 475 U.S. 469, 479 (1986) (citing *Monell*, 436 U.S. at 66–683). Accordingly, plaintiffs seeking to impose § 1983 liability on governments must generally "prove that 'action pursuant to official municipal policy' caused their injury." *Connick*, 563 U.S. at 60–61 (quoting *Monell*, 436 U.S. at 691). "Official municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law. In limited circumstances, a local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of § 1983." *Id.* at 61 (citing *Pembaur*, 475 U.S. at 480–81; *Monell*, 436 U.S. at 691; *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 167–68 (1970) ).

To survive a motion pursuant to Rules 12(b)(6) or 12(c), a plaintiff cannot merely allege the existence of a municipal policy or custom, but "must allege facts tending to support, at least circumstantially, an inference that such a municipal policy or custom exists." *Santos v. N.Y.C.*, 847 F. Supp. 2d 573, 576 (S.D.N.Y. 2012) (citing *Dwares v. City of New York*, 985 F.2d 94, 100 (2d Cir. 1993) ); *see also Zherka v. City of New York*, 459 F. App'x 10, 12 (2d Cir. 2012) (summary order); *Zahra v. Town of Southold*, 48 F.3d 674, 685 (2d Cir. 1995). Boilerplate allegations that "the City 'fail[ed] to adequately [ ] discipline[ ] and supervise' employees and 'fail[e]d to promulgate and put into effect appropriate rules and regulations applicable to the duties and behavior' of its employees ... [are] 'insufficient to raise an inference of the existence of a custom or policy.' " *Bradley v. City of New York*, No. 08-CV-1106 (NGG), 2009 WL 1703237, at *3 (E.D.N.Y. June 18, 2009) (citations omitted); *see also Duncan v. City of New York*, No. 11-CV-3826 (CBA) (JO), 2012 WL 1672929, at *3 (E.D.N.Y. May 14, 2012).

*8 Smalls' amended complaint advances several theories of *Monell* liability. As to one, it adequately states a claim: it alleges that Smalls was deprived of his rights when NYPD officers, without evidence he committed a crime, arrested him on NYCHA property and subsequently cited him for criminal trespass. (Am. Compl. ¶ 73.) It asserts that this arrest was executed pursuant to the NYPD's "unconstitutional" "policy of unlawful detaining and

arresting NYCHA residents and their guests for the purported offense of trespassing, despite no probable cause that a crime had occurred." (*Id.*) In support of this general allegation, the amended complaint references a New York Times article describing the policy. (*Id.* n.1.); *see also Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002) ("For purposes of [Rule 12(b) ], 'the complaint is deemed to include ... any statements or documents incorporated in it by reference.' " (quoting *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995) ) ). The article states that the police stops that often lead to arrests for trespassing on NYCHA property are "routine," and notes that, as of 2014, such arrests were the subject of a lawsuit against the NYPD. Goodman, *Police Patrols, supra.*

Accepting as true all allegations in the amended complaint and drawing all reasonable inferences in Smalls' favor, these allegations support, "at least circumstantially," the inference that the City engages in the practices or policies alleged. *Santos*, 847 F. Supp. 2d at 576; *see also Guerrero v. City of New York*, No. 16-CV-516 (JPO), 2017 WL 2271467, at *3 (S.D.N.Y. May 23, 2017) (quoting *Zherka*, 459 F. App'x at 12). The allegations are therefore sufficient to state a *Monell* claim. *See Iqbal*, 556 U.S. at 678; *Alcantara*, 751 F.3d at 75.

Smalls' other theories of *Monell* liability fail for various reasons. The only other policy or practice alleged with any specificity is the NYPD's regular ticketing of NYCHA residents and visitors for "lingering" in common areas. (Am. Compl. ¶ 73.) This policy is also detailed in the New York Times article. Smalls, however, does not allege that *he* was arrested for lingering. As such, that policy or practice cannot be the basis for municipal liability. *See City of Canton*, 489 U.S. at 385 (requiring a "direct causal link between a municipal policy or custom and the alleged constitutional deprivation").

Other policies or practices alleged in the amended complaint include "wrongfully arresting individuals ...: due to perceived lack of respect for the police," "wrongfully arresting individuals engaged in first amendment protected expression," the "pervasive failure to train, supervise, instruct and discipline police officers with respect to the constitutional rights of citizens," and the "Blue Wall of Silence." (Am. Compl. ¶ 73.) The amended complaint does not allege that any of these policies is official. *See Connick*, 563 U.S. at 60–61 (requiring "action pursuant to official municipal policy").

Smalls could alternatively establish *Monell* liability by showing that these policies or practices are so "persistent and widespread as to practically have the force of law," *id.* at 61, but the amended complaint fails equally in this regard. Outside of its conclusory allegations that the NYPD's failure to train is "pervasive," and the "Blue Wall of Silence," is "widespread," the amended complaint says nothing about prevalence. (Am. Compl. ¶ 73.) Indeed, it provides no factual enhancement at all. *See Santos*, 847 F. Supp. 2d at 576 (requiring a *Monell* complaint to "allege facts tending to support ... an inference that such a municipal policy or custom exists."). Notably, it does not allege "any details about other instances of police misconduct ... which would suggest a pattern or practice of abuse, nor [doe]s [it] identif[y] any reports or investigations which suggest deficiencies in" the NYPD's approach to training, reporting misconduct, or respecting First Amendment expression. *Triano v. Town of Harrison*, 895 F. Supp. 2d 526, 536–37 (S.D.N.Y. 2012). With respect to the alleged failure to train, in particular, the amended complaint neither "identif[ies] a specific deficiency in the city's training program [nor] establish[es] that deficiency is 'closely related to the ultimate injury.' " *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 129 (2d Cir. 2004) (quoting *City of Canton*, 489 U.S. at 391).

*9 All told, Smalls' allegations of these policies or practices, "without any facts suggesting [their] existence, are plainly insufficient." *Moore v. City of New York*, No. 08-CV-8879 (PGG), 2010 WL 742981, at *6 (S.D.N.Y. Mar. 2, 2010) (quoting *Missel v. Cty. of Monroe*, 351 F. App'x 543, 545 (2d Cir. 2009) ). Insofar as the amended complaint asserts § 1983 causes of action against the City arising from these policies or practices, they are dismissed for failure to state a claim. *See Iqbal*, 556 U.S. at 678; *Alcantara*, 751 F.3d at 75.

### III. Leave to Amend

In his opposition, Smalls moves for leave to amend his complaint to name the John Doe officers. As discussed, *supra* Part II, the statute of limitations on Smalls' claims against the John Doe officers has long since expired. " 'John Doe' pleadings cannot be used to circumvent statutes of limitations because replacing a 'John Doe' with a named party in effect constitutes a change in the party sued. John Doe substitutions, then, may only be accomplished when all of the specifications of Fed. R. Civ. P. 15(c) are met." *Hogan v. Fischer*, 738 F.3d 509, 517 (2d Cir. 2013) (internal quotation marks omitted) (quoting *Aslanidis v. U.S. Lines, Inc.*, 7 F.3d 1067, 1075 (2d Cir. 1993) ). Rule 15(c), in turn, permits

claims against a substituted party to relate back to the time of earlier pleadings only if, within the Rule 4(m) period for service, the parties "to be brought in by amendment ... received such notice of the action that [they] would not be prejudiced" and "knew or should have known that the action would have been brought against [them], but for a mistake concerning ... identity." Fed. R. Civ. P. 15(c).

Here, there is no indication that either of these conditions was met during the 4(m) period or in the years since it expired. In contrast to Officer Ngai, with whom the City admits discussing the lawsuit, there is nothing in the record to suggest that the John Doe officers had notice of the case. From its inception, the case has not involved them. Indeed, their identities are still unknown, the only evidence of such being a disclosure from the City prepared in the summer of 2016. Claims against these officers, even if they were to be identified at this late date, could not be said to relate back to Smalls' complaint within the meaning of Rule 15(c). Given this, and given that Smalls' claims against the John Doe officers are otherwise time-barred, *see* Fed. R. Civ. P. 15(c), any amendment for the purpose of naming the officers would be futile. Accordingly, Smalls' motion to amend is denied. *See Foman v. Davis*, 371 U.S. 178, 182 (1962) (holding that "futility of amendment" is grounds to deny leave to amend).

## CONCLUSION

Smalls' request for an extension of time to serve Officer Ngai is denied, and his claims against Officer Ngai are dismissed pursuant to Rule 4(m). Smalls' *Monell* claim against the City based on the NYPD's alleged policy or practice of arresting visitors to NYCHA properties for trespassing may proceed. To the extent Smalls brings claims based on other theories of *Monell* liability, they are dismissed. Accordingly, the City's motion for judgment on the pleadings (Doc. No. 44) is granted in part and denied in part. Lastly, Smalls' motion for leave to amend his complaint to name the John Doe officers is denied. This case is recommitted to Chief Magistrate Judge Mann for any further discovery and for pretrial arrangements.

*10 SO ORDERED.

**All Citations**

Slip Copy, 2019 WL 1243823

**Footnotes**

1    Chief Magistrate Judge Mann noted in her order that, at the time Smalls filed his original complaint in May 2015, the time for service permitted by Rule 4(m) was 120 days. (Order to Show Cause at 1.) After this case was filed, Rule 4 (m) was amended to require service within a shorter 90-day period after the filing of the complaint. *See* Fed. R. Civ. P. 4, Advisory Committee Notes on the 2016 Amendment.

End of Document                © 2019 Thomson Reuters. No claim to original U.S. Government Works.

WestlawNext. © 2019 Thomson Reuters    Thomson Reuters Privacy Policy    Thomson Reuters is not providing legal advice    THOMSON REUTERS

Grant v. City of New York | WestlawNext
Case 1:19-cv-02441-KAM-LB Document 1 Filed 04/22/19 Page 29 of 56 PageID #: 29
Page 1 of 12

WESTLAW

Grant v. City of New York
United States District Court, E.D. New York.   March 8, 2019   Slip Copy   2019 WL 1099945   (Approx. 13 pages)

2019 WL 1099945
Only the Westlaw citation is currently available.
United States District Court, E.D. New York.

Philip GRANT, Plaintiff,
v.
CITY OF NEW YORK, Detective Evelin Gutierrez, Detective Niurca
Quinones, Shield #3310, Detective Maribel Roman, Shield #5530, and
Lieutenant Commander Patrick Montagano, Defendants.

15-CV-3635 (ILG) (ST)
|
Signed 03/08/2019

**Attorneys and Law Firms**

Nicole Bellina, Stoll, Glickman, & Bellina LLP, Brooklyn, NY, for Plaintiff.

Melanie Mary Speight, New York City Law Department, New York, NY, for Defendants.

MEMORANDUM AND ORDER

I. Leo Glasser, U.S.D.J.

*1 Plaintiff Philip Grant brings this action, pursuant to 42 U.S.C. § 1983 and state law,
against Defendants City of New York (the "City"), Lieutenant Commander Patrick
Montagano and Detectives Evelin Gutierrez, Niurca Quinones and Maribel Roman for false
arrest, malicious prosecution and deprivation of due process of law. (ECF No. 17). Before
the Court is Defendants' motion for summary judgment on all claims. (ECF No. 41). For the
reasons that follow, the motion is GRANTED in part and DENIED in part.

BACKGROUND

In the early hours of August 27, 2013, a woman, referred to herein as "Jane Doe," was
robbed and sexually assaulted near Evergreen and Bleecker Avenues in Brooklyn. (Def. Ex.
H (Complaint Room Screening Sheet) ).[1] Shortly after the attack, Jane Doe told police that
her assailant was an African-American man, approximately 5'6" to 5'8" in height, 30 to 40
years old, with "deformed or big teeth." (Def. Ex. I (Gutierrez DD5, No. 2).[2] Plaintiff was
arrested and prosecuted for the crime before the charges were ultimately dismissed.

Before a chronology of the facts is given, mention must be made of the significant
differences between Plaintiff's physical appearance and that of the suspect. Plaintiff is 6'5"
tall. (Def. Ex. O (Arrest Report); Grant Dep. at 18:21-22). He was 58 years old when he was
arrested. (Def. Ex. O; Grant Dep. at 18:1-2). He does not have "deformed teeth," or indeed
any facial deformity (Roman Dep. at 122:21-123:2), and Plaintiff's arresting officer herself
admitted that she did not think he looked like the composite sketch of the suspect (id. at
141:3-6). In addition, Plaintiff walks with a limp due to an injury he sustained several years
before these events. (Id. at 114:14-15; Grant Dep. at 33:9-34:25). At the time of arrest, the
detectives were in possession of a video of the attacker, which showed that he was much
younger and shorter than Plaintiff and that he did not walk with a limp. (Def. Ex. W
(Proceedings, Ind. No. 7712/13 (N.Y. Sup. Ct., Kings County Jul. 25, 2014) ) at 4:19-24).[3]
The record points to no physical similarity whatsoever between Plaintiff and the suspect
other than the fact that they are both African-American. (Def. Exs. I, O).

*2 In the days following the attack, an investigation was conducted by Defendants Gutierrez,
Roman and Quinones of the Brooklyn Special Victims Squad. Defendant Montagano was
the commanding officer of that squad at the time. (Montagano Dep. at 23:17-20). The
detectives obtained surveillance footage that showed Jane Doe being followed by an
unknown man, presumably her attacker. (Roman Dep. at 76:11-14). In addition, a composite
sketch of the attacker was drawn, which Roman placed at various locations throughout the
area. (Id. at 89:7-91:12). The manager of a local grocery recognized the man in the sketch
as one of his customers, noting that there was "something wrong with his face" (Pl. Ex. 13
(Roman DD5) ),[4] but it does not appear that the detectives pursued this lead any further.

Plaintiff's name surfaced on September 3, 2013, after Gutierrez and Roman encountered a woman named Alfreda Darvey while canvassing the area of the crime. (Def. Ex. K (Gutierrez DD5, No. 25) ). The detectives asked her whether she knew of a "tall" black man who frequented the area. (*Id.*). As previously mentioned, the detectives had no reason to believe that the suspect was "tall," as the victim described him as between 5'6" and 5'8". There is no indication that Darvey was given descriptors such as the suspect's facial deformity or age. (*Id.*; Roman Dep. at 72:12-14). Darvey told the detectives that the person they were looking for "could be Phil" and indicated that "Phil" lived on 11 Stanhope Street (Def. Ex. K; Roman Dep. at 72:3-5, 73:16-19, 75:4-7).[5] Darvey was never shown the sketch or the video of the suspect. (Roman Dep. at 141:19-142:2, 142:14-16).

Based on the information provided by Darvey, the detectives learned that Plaintiff was a resident of 11 Stanhope Street and investigated him as a suspect. (*Id.* at 103:12-25). At this point, there was nothing tying Plaintiff to Jane Doe's attack other than Darvey's statement. (*Id.* at 123:3-7). Although the sketch and video of the attacker were distributed around the neighborhood (*id.* at 9:9-12, 141:11-12), Roman was unable to recall anyone who identified Plaintiff as the suspect based on those materials (*id.* at 142:5-16).[6]

What happened next is heavily disputed, but a reasonable trier of fact, weighing the conflicting evidence and resolving all ambiguities and credibility determinations in Plaintiff's favor, could infer that the following events transpired.

At approximately 1:20 p.m. on September 3, 2013, Roman showed Jane Doe a photo array of six persons, including Plaintiff. (Pl. Ex. 5 (Photo Array Viewing Report) ). She did not identify Plaintiff as her attacker. (*Id.*). At approximately 1:40 p.m., twenty minutes after the photo array, Roman and Gutierrez drove Jane Doe around the area. (Pl. Ex. 9 (Gutierrez DD5, No. 27) ). Jane Doe was explicitly instructed to point out anyone who fit the description of her attacker. (Def. Ex. M (Gutierrez DD5, No. 28); Roman Dep. at 106:14-19). At 1:45 p.m., Gutierrez received a call from Detective Sara Mathers requesting that she and Roman bring Jane Doe to Stanhope Street. (Def. Ex. M; Roman Dep. at 102:6-103:3; Mathers Dep. at 51:19-24). Roman's understanding was that Mathers, who was presently at Stanhope Street (Mathers Dep. at 51:19-21), made this call because she had just seen someone emerge from Plaintiff's residence (Roman Dep. at 108:22-109:9). The car arrived on Stanhope Street within "[m]inutes." (*Id.* at 107:3). It first passed by several black males walking on either side of the street, but Jane Doe did not say anything. (*Id.* at 107:3-10, 108:3-5). The car then passed by Plaintiff, who was standing or sitting in front of 11 Stanhope Street. (*Id.* at 107:10, 108:11-19). Upon seeing Plaintiff, Jane Doe shouted, "That's him. That's him. That's him." (*Id.* at 107:10-11). With that identification, Roman and Gutierrez exited the vehicle and arrested Plaintiff. (*Id.* at 109:21-25; Def. Ex. M).[7]

**\*3** Plaintiff was transported to the Special Victims Squad in Brooklyn where he was interrogated, repeatedly professing his innocence. (Grant Dep. at 90:9-10, 106:3-8). Gutierrez, Roman and Quinones all participated in the interrogation. (Def. Ex. P (Quinones DD5, No. 24); Def. Ex. Q (Roman DD5, No. 29) ). During the interview, Plaintiff brought up an unrelated incident that occurred the previous week—*i.e.*, the week of Jane Doe's assault—in which he was assaulted and chased away by two men near Evergreen Avenue. (Def. Exs. P, Q; Roman Dep. at 123:23-24, 124:9-18). At the time of his questioning, Plaintiff could not recall whether this altercation occurred on the same night as the assault being investigated. (Def. Ex. P). At this point in the interview, Quinones[8] asked Plaintiff whether he "could have seen" Jane Doe that day when he was running down the block. (Grant Dep. at 100:6-15). Plaintiff replied, "I don't know who was on the block. ... I could have seen her. If she was on the block, she could have seen me. Because anybody could have been on the block." (*Id.* at 100:19-24). Quinones told Plaintiff to "just say that you could have seen her" and began writing down a statement for Plaintiff to sign. (*Id.* at 108:13-20). Plaintiff responded that the incident happened in the daytime, but Quinones responded, "oh, don't worry about that. Don't worry about that," adding, "I'm just going to put down here that you could have seen [her]." (*Id.* at 108:21-25). Quinones then wrote out a statement reciting that Plaintiff was attacked by two men "at night" and that while he was running toward Evergreen Avenue he "pass[ed] the white girl." (Def. Ex. R (Statement); Def. Ex. P). Plaintiff signed the statement because Quinones told him that if he did so he would be allowed to go home. (Def. Ex. R; Grant Dep. at 110:9-111:20). Plaintiff also signed a photograph of Jane Doe identifying her as the "white girl" he saw. (Def. Ex. P).[9]

A police report has been produced in this case showing that Plaintiff was assaulted near Evergreen Avenue and Stanhope Street on August 25, 2013—more than one day *before* the

August 27, 2013 assault of Jane Doe. (Pl. Ex. 10). The August 25, 2013 incident occurred during the daytime, consistent with what Plaintiff told Quinones. (*Id.*).[10]

Following the interrogation, the matter was referred to the Kings County District Attorney's Office. The Assistant District Attorney assigned to the case spoke to Roman, Quinones, Jane Doe, and Jane Doe's boyfriend. (Def. Exs. H, I; Zipkin Dep. at 9:18-21). The ADA did not speak to Gutierrez. (Zipkin Dep. at 13:21-23). Quinones[11] told the ADA that Plaintiff made the following verbal statement: "[Grant] states in substance that [Jane Doe] looks familiar. [Grant] saw [Jane Doe] on street. [Grant] was running because he was being chased by a group of young Hispanics. He was on Evergreen running toward Bushwick." (Def. Ex. H). Quinones also gave the ADA Plaintiff's written statement that he "saw the white girl."[12] In addition, Roman falsely[13] told the ADA that she and Gutierrez "showed the video and sketch to several individuals in the neighborhood who stated they recognized the individual as [Grant]." (*Id.*; Zipkin Dep. at 13:10-23).

*4 Based on this information, the ADA drafted a criminal complaint against Plaintiff. (Def. Ex. S (Complaint) ). At arraignment, the prosecution disclosed its intention to use Plaintiff's statement at trial. (Pl. Ex. 12). Plaintiff was thereafter detained at Riker's Island. (Grant Dep. at 119:3).

On September 9, 2013, Plaintiff was indicted by a grand jury. (Def. Ex. T (Indictment) ). The grand jury was informed of Plaintiff's purported statement to Quinones that Jane Doe "looks familiar" and that he "saw" her on the street. (Pl. Ex. 11 (Grand Jury Synopsis Sheet) ). The grand jury was also informed that a photo array was administered which failed to produce a hit, and that Jane Doe "pointed out" Plaintiff during a "canvas" [sic] with Roman. (*Id.*). However, certain key details may have been omitted from what was presented to the grand jury. There is no record of the grand jury being informed of the substantial physical differences between Plaintiff and the suspect; the fact that Plaintiff was only investigated because a witness (Darvey) was given an inaccurate physical description of the suspect; or the fact that the identification took place less than half an hour after the photo array. Although the grand jury was informed that the police possessed a video of the suspect (*id.*), there is no indication that the video was played for the grand jury, or that the grand jury was otherwise aware that the video depicted a man whose appearance was very different from Plaintiff's (Def. Ex. W at 4:19-24).

On November 27, 2013, the Office of the Chief Medical Examiner concluded tests of DNA that had been found on Jane Doe's belongings, presumably from her attacker. (Def. Ex. V (Office of the Chief Medical Examiner Laboratory Report) ). The DNA did not match Plaintiff's. (*Id.*).

On July 25, 2014, the prosecution, citing the questionably valid identification of Plaintiff and other deficiencies in the investigation, moved to dismiss all of the charges. (Def. Ex. W). The charges were promptly dismissed. (*Id.* at 4:25-5:1).

## DISCUSSION

### I. Standard of Review

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is material if it might affect the outcome of the case under governing law." *Fireman's Fund Ins. Co. v. Great American Ins. Co. of New York*, 822 F.3d 620, 631 n. 12 (2016) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ). "A dispute is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.' " *Id.* (quoting *Anderson*, 477 U.S. at 248). "In making this determination, the Court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Id.* (citations and internal quotation marks omitted); *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Anderson*, 477 U.S. at 255. "The evidence of the non-movant is to be believed" to the extent that a jury could reasonably believe it. *Id.* Conversely, "the court ... must disregard all evidence favorable to the moving party that the jury is not required to believe." *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150 (2000).

### II. False Arrest

*5 The elements of a cause of action for false arrest under New York law are (1) intentional confinement by the defendant, (2) of which the plaintiff was aware, (3) to which the plaintiff

did not consent, and (4) which was not otherwise privileged. *See Broughton v. State*, 37
N.Y.2d 451, 456 (N.Y. 1975), *cert. denied*, 423 U.S. 929 (1975). The same elements apply
for a false arrest action under § 1983 and the Fourth Amendment. *See Weyant v. Okst*, 101
F.3d 845, 852 (2d Cir. 1996). Only the fourth element is disputed in this case.

1. Probable Cause

"The existence of probable cause to arrest constitutes justification and 'is a complete
defense to an action for false arrest.' " *Id.* (quoting *Bernard v. United States*, 25 F.3d 98, 102
(2d Cir. 1994) ). "[P]robable cause to arrest exists when the officers have knowledge or
reasonably trustworthy information of facts and circumstances that are sufficient to warrant a
person of reasonable caution in the belief that the person to be arrested has committed or is
committing a crime." *Id.* Where, as here, an arrest is not made pursuant to a judicial warrant,
the burden falls on the defendant to establish that the plaintiff's arrest was supported by
probable cause. *See Director General of Railroads v. Kastenbaum*, 263 U.S. 25, 27 (1923)
(Taft, C.J.); *Mitchell v. City of New York*, 841 F.3d 72, 77 (2d Cir. 2016); *Broughton*, 37
N.Y.2d at 457.

Generally, "a law enforcement official has probable cause to arrest if he received his
information from ... the putative victim or eyewitness." *Panetta v. Crowley*, 460 F.3d 388, 395
(2d Cir. 2006) (quoting *Martinez v. Simonetti*, 202 F.3d 625, 634 (2d Cir. 2000) ). However,
the "officer may not disregard plainly exculpatory evidence." *Id.* Furthermore, an eyewitness
identification alone cannot support probable cause if the procedure so "substantially
increase[d] the dangers of misidentification" as to be "improperly suggestive" under the
circumstances. *Dufort v. City of New York*, 874 F.3d 388, 348 (2d Cir. 2017) (citations and
quotation marks omitted); *see also Jenkins v. City of New York*, 478 F.3d 76, 93 (2d Cir.
2007).

Generally, "point-outs," where a witness spontaneously encounters the perpetrator of a
crime and identifies him or her to the police, are unlikely to create a risk of misidentification
and are therefore often sufficient to establish probable cause. *See U.S. v. Serna*, 799 F.2d
842, 847 (2d Cir. 1986), *cert. denied*, 481 U.S. 1013 (1987), *overruled on other grounds*,
*U.S. v. DiNapoli*, 8 F.3d 909 (2d Cir. 1993) (en banc); *Brinson v. Annetts*, No. 05-CV-5582,
2008 WL 4282617, at *8 (E.D.N.Y. Sept. 16, 2008). Nevertheless, the specific type of
procedure employed in this case—where a victim is escorted or driven by police around the
area of a crime and instructed to point out her attacker—bears aspects of a show-up. While
vehicle canvasses such as these are not presumptively unreliable, *see Brinson*, 2008 WL
4282617, at *7-*8, they raise concerns that do not necessarily arise in the context of "true"
point-outs. As the New York Court of Appeals explained in a case involving this exact type of
procedure:

> An identification by a witness may be 'spontaneous' in the sense that it is
> unprompted, yet still be the product of a police-arranged procedure.... [T]he
> canvassing of the crime area in the police car was an identification procedure
> undertaken at the 'deliberate direction of the State.' It is undisputed that the
> victim was escorted to the crime scene by police, indicating that this was a
> confrontation arranged *for the distinct purpose of identifying the perpetrators
> of the mugging* .... This planned identification encounter is distinguishable
> from those non-police-sponsored identifications resulting from mere
> happenstance, such as where a witness is present in police headquarters for
> some purpose other than to effectuate an identification, and by chance views
> and identifies a suspect who is being processed in another room.

*6 *People v. Dixon*, 85 N.Y.2d 218, 223 (N.Y. 1995) (emphasis in the original) (internal
citations omitted).

In this case, there exist a number of factors which, viewed in the light most favorable to
Plaintiff, and taken collectively, would support a firm conviction in the mind of a reasonable
juror that Plaintiff's arresting officers lacked probable cause.

First, as mentioned in the beginning of this opinion, there are no similarities between
Plaintiff's appearance and that of the suspect, none whatsoever which could reasonably be
supported by the record, other than the fact that they are both black. Beyond that, the
differences are vast. Notably, the suspect was described as being much shorter than Plaintiff
and had a distinct facial deformity, which at least one other witness was able to corroborate
based on the sketch. Plaintiff is also significantly older than the suspect and walks with a

limp or gait which the suspect did not have. Of course, inconsistencies between initial witness statements and the details revealed by investigation are inevitable and do not automatically negate probable cause. See *Norwood v. Mason*, 524 Fed.Appx. 762, 765 (2d Cir. 2013) (summary order); *Davenport v. City of New York*, No. 15-CV-5890, 2017 WL 4356883, at *12 (E.D.N.Y. Sept. 28, 2017). But this case is different. The detectives were not only in possession of the victim's *description* of the suspect; they had *video* of him as well. As the prosecutor stated on the record in dismissing the charges against Plaintiff, "the person on [the video] seems to be much shorter than [Plaintiff], much younger than [Plaintiff], and doesn't have the pronounced limp ... that [Plaintiff] has." (Def. Ex. W at 4:20-24). This amounted to concrete evidence, uncorrupted by the follies of human memory or perception, that Plaintiff was not the attacker.

Second, the reliability of Jane Doe's identification may be called into question because, a mere half an hour beforehand, she was shown a photo array containing Plaintiff's photograph and failed to identify him as the culprit. A robust body of social science research has shown that witnesses who are confronted with an image of an innocent person are more likely to misidentify that same person in a subsequent confrontation, see Gary L. Wells & Deah S. Quinlivan, *Suggestive Eyewitness Identification Procedures and the Supreme Court's Reliability Test in Light of Eyewitness Science: 30 Years Later*, 33 Law & Hum. Behav. 1, 8 (2009) (collecting studies); Kenneth A. Deffenbacher, Brian H. Bornstein & Steven D. Penrod, *Mugshot Exposure Effects: Retroactive Interference, Mugshot Commitment, Source Confusion, and Unconscious Transference*, 30 Law & Hum. Behav. 287, 299 (2006) (meta-analysis shows that the risk of misidentifying an innocent person in a lineup increases from 15% to 37% if the witness sees the innocent person in a prior mugshot, which "supports the hypothesis that mugshot exposure increases the false alarm rate at a subsequent lineup"), and numerous courts have acknowledged this phenomenon, see *Young v. Conway*, 698 F.3d 69, 78 (2d Cir. 2012); *Dennis v. Secretary, Pennsylvania Department of Corrections*, 834 F.3d 263, 327-329 (3d Cir. 2016) (McKee, J., concurring); *DaCosta v. Tranchina*, 281 F.Supp.3d 291, 302 (E.D.N.Y. Dec. 12, 2017), *appeal filed*, No. 18-95 (2d Cir.); *Jacobs v. City of Milwaukee Police Dept.*, No. 14-CV-1016, 2015 WL 5131131, at *8 (E.D. Wis. Sept. 1, 2015); *Commonwealth v. Gomes*, 470 Mass. 352, 375-376, 22 N.E.3d 897 (Mass. 2015); *State v. Henderson*, 208 N.J. 208, 255-256, 27 A.3d 872 (N.J. 2011). In this case, the exposure to Plaintiff's photograph may have predisposed her to affirmatively identify Plaintiff less than half an hour later, when she viewed the same man during the canvass. Of course, a witness identification is not categorically unreliable solely because the witness failed to identify the suspect in a prior photo array, provided that there is "no additional evidence [suggesting] that [the] identification was mistaken or fabricated." *Celestin v. City of New York*, 581 F.Supp.2d 420, 431-432 (E.D.N.Y. 2008). But it is a factor that cuts against a finding of probable cause. See *DaCosta*, 281 F.Supp.3d at 309-310.

*7 Third, Plaintiff's name would have never surfaced in the investigation were it not for Darvey's initial statement that the man the detectives were looking for "could be Phil." This lead was unreliable, as it was based on incomplete and inaccurate information provided by the detectives. Roman and Gutierrez's description of the person they were looking for as "tall" did not apply to the suspect, but it did apply to Plaintiff, and explains why Darvey said that the man "could be Phil." There is no indication that the detectives provided other information, such as the suspect's age or facial deformity, upon which Darvey's tentative identification could be based, nor was she shown the sketch or video of the suspect. In any event, Darvey's statement was a grossly insufficient basis to regard Plaintiff as a suspect; it provided the detectives with no more basis to suspect Plaintiff of being the attacker than any other "tall" black man. "It has long been established ... that when the description could have applied to any number of persons and does not single out the person arrested, probable cause does not exist." *Jenkins*, 478 F.3d at 90. The officers should have known that Plaintiff's name did not surface as a result of any bona fide connection to the attack; for all intents and purposes, he was selected at random.

Collectively, these facts would have put Plaintiff's arresting officers on notice that they might have arrested the wrong man, vitiating probable cause.

## 2. Personal Involvement

The preceding analysis shows that a reasonable juror could find Plaintiff's arrest to be lacking in probable cause. The remaining question is which individual Defendants may be held liable. As Plaintiff's arresting officer, there is no dispute that Roman is a proper Defendant for the false arrest claim. However, Defendants argue that Roman is the *only* individual who may be held liable.

An individual defendant may be held liable for false arrest only if he or she was personally involved and actually and proximately caused the unlawful arrest. *See Annan v. City of New York Police Dept.*, No. 12-CV-2702, 2014 WL 10416919, at *16 (E.D.N.Y. Sept. 9, 2014), *report and recommendation modified on other grounds and adopted as modified*, 2015 WL 5552271 (Sept. 18, 2015), *reconsideration denied*, 2015 WL 9581812 (E.D.N.Y. Dec. 29, 2015); *Sherman v. County of Suffolk*, 71 F.Supp.3d 332, 357 (E.D.N.Y. 2014); Restatement (Second) of Torts §§ 9, 37 (1965).

In this case, a genuine dispute of fact exists as to Gutierrez's level of personal involvement in Plaintiff's arrest. While she is not listed on the arrest report as Plaintiff's arresting officer (Def. Ex. O), her DD5 report states that both she and Roman "apprehend[ed]" Plaintiff. (Def. Ex. M). *See Provost v. City of Newburgh*, 262 F.3d 146, 155 (2d Cir. 2001) (section 1983 "does not foreclose the liability of a person who, with knowledge of the illegality, participates in bringing about a violation of the victim's rights [by] helping others to do the unlawful acts").

However, Plaintiff's false arrest claim must fail against Quinones. Critically, there is no evidence that Quinones was at the scene of the arrest, or that she was even involved in the canvass and show-up that led to the arrest. Furthermore, although Quinones was involved in the pre-arrest phase of the investigation to at least some extent (ECF No. 43 (Def. Rule 56.1 SOF) ¶ 4; Pl. Ex. 7 (Quinones DD5, No. 22) ), there is no evidence that she took any action which might foreseeably have caused Plaintiff to suffer an unconstitutional arrest. *Cf. Rhooms v. City of New York*, No. 11-CV-5910, 2017 WL 1214430, at *7 (E.D.N.Y. Mar. 31, 2017).

For the foregoing reasons, summary judgment as to the false arrest claims is denied as to Defendants Roman and Gutierrez and granted as to Defendant Quinones.

### III. Due Process Claims

Liberally construed, Plaintiff's due process claim is based on the fabrication of evidence. To prevail on a claim based on fabrication of evidence, a plaintiff must demonstrate that (1) an investigating official, (2) has fabricated evidence (3) that is material, (4) forwards that information to prosecutors, and (5) thereby causes plaintiff to suffer a deprivation of liberty. *See Garnett v. Undercover Officer C0039*, 838 F.3d 265, 279 (2d Cir. 2016); *Cook v. City of New York*, 243 F.Supp.3d 332, 351 (E.D.N.Y. 2017); *Soomro v. City of New York*, 174 F.Supp.3d 806, 815-816 (S.D.N.Y. 2016). An officer may be liable if he or she affirmatively submits falsified evidence, such as a false confession, to the authorities, *see Ricciuti v. New York City Transit Authority*, 124 F.3d 123, 130 (2d Cir. 1997), or withholds material information that, if disclosed, would cause prosecutors to doubt whether charges should be filed, *see Bermudez v. City of New York*, 790 F.3d 368, 374-376 (2d Cir. 2015). Evidence is material if it would "likely ... influence a jury's decision" in a criminal proceeding against the plaintiff. *Garnett*, 838 F.3d at 280; *see Soomro v. City of New York*, 174 F.Supp.3d at 815-816.

*8 A period of post-arraignment confinement caused by the prosecutor's decision to bring charges suffices as a deprivation of liberty for purposes of a due process claim. *See Garnett*, 838 F.3d at 277. There is no dispute that Plaintiff suffered a deprivation of liberty. To establish causation, the plaintiff need not show that "the falsified information [was] the *only* reason the plaintiff suffered a deprivation of his liberty," *Garnett*, 838 F.3d at 277 (emphasis in the original), but only that it was a "substantial factor in bringing about the harm," *Nnodimele v. Derienzo*, No. 13-CV-3461, 2016 WL 337751, at *14 (E.D.N.Y. Jan. 27, 2016) (citations and internal quotation marks omitted), and that the harm was a "reasonably foresee[able] consequence" of the defendant's actions, *Zahrey v. Coffey*, 221 F.3d 342, 352 (2d Cir. 2000). On summary judgment, materiality and causation merge; if evidence is material, then this will usually suffice to raise an issue of fact as to whether it contributed to the decision to initiate criminal proceedings. *See Dufort*, 874 F.3d at 352 (failure by defendants to inform prosecutors of facts rendering eyewitness identification unreliable raised a triable issue of fact as to causation); *Bermudez*, 790 F.3d at 376 (holding that, for purposes of summary judgment, plaintiff raised a triable issue of fact as to proximate causation where a jury could find that the defendant "prevented [the prosecutor] from making an informed decision about the reliability of [the] evidence [against the plaintiff]"); *see also Dura-Bilt Corp. v. Chase Manhattan Corp.*, 89 F.R.D. 87, 98 n. 11 (S.D.N.Y. 1981) ("materiality supports causation" in that decisionmakers are unlikely to be "indifferent" to material information).

In this case, a reasonable trier of fact could find that Roman knowingly submitted false, material evidence to the ADA. Specifically, Roman told the ADA that individuals in the neighborhood identified Plaintiff as Jane Doe's attacker based on the sketch and/or video of

the suspect. But in her deposition testimony, Roman was unable to recall anyone who identified Plaintiff from these materials, and from this a reasonable trier of fact, drawing all inferences in Plaintiff's favor, could conclude that no such identification occurred. Furthermore, Roman affirmatively testified that there was no evidence linking Plaintiff to the crime at the time of his arrest other than Jane Doe's identification. The materiality of this information cannot reasonably be disputed—if there had indeed been another individual who recognized Plaintiff, then this would have been valuable independent corroboration of Jane Doe's eyewitness identification—and this raises a genuine issue of fact as to whether this information contributed to the decision to prosecute.

A reasonable trier of fact could also find Quinones knowingly submitted false, material evidence to the ADA. Specifically, the record supports a finding that she passed along Plaintiff's written statements that he "saw" Jane Doe while being chased down Evergreen Avenue. As previously noted, the assault that Plaintiff described in his written statement occurred on August 25, 2013, not on August 27, 2013 when Jane Doe's assault occurred. From this fact, a jury could find that Plaintiff's written statement was false—that he never saw Jane Doe at all, and only made this admission only because Quinones pressed him and assured him that he would be able to go home. Furthermore, Plaintiff testified that he told Quinones the altercation occurred during the "daytime" (consistent with the police report subsequently produced in this case) and that Quinones told him, "don't worry about that" before having him sign the statement that he saw Jane Doe "at night." Under these circumstances, the record could support a finding that Quinones furnished Plaintiff's written statement to the ADA with knowledge that it was false, or, at the very least, without disclosing the heavily suggestive circumstances under which it was procured.

Quinones also told the ADA that Plaintiff made a verbal admission that Jane Doe "looked familiar" and that he "saw" her while running down Evergreen Avenue. Quinones' DD5 report states that Plaintiff made an oral statement to this effect. However, this is inconsistent with Plaintiff's testimony; according to Plaintiff, he merely said that "anybody could have been on the block," or words to that effect. A trier of fact could choose to credit Plaintiff's testimony and discredit Quinones' DD5 report, particularly since, as explained above, the jury could find that Plaintiff never saw Jane Doe, and could presume that he would not voluntarily admit to seeing someone he did not see. Under these circumstances, a juror could find that Quinones submitted falsified evidence to the ADA by passing along a verbal statement that Plaintiff never made.

*9 A jury could find that the written and verbal statements that Plaintiff "saw" Jane Doe, possibly on the night of her assault, were material and influenced the decision to prosecute. While they did not directly incriminate him, they could be used to bolster the credibility of Jane Doe's identification of him by showing that his connection to Jane Doe was not purely coincidental. That this statement was material is further evidenced by the fact that the prosecution announced its intent to introduce it at trial, as well as the fact that it was disclosed to the grand jury.

Plaintiff's due process claim against Gutierrez, however, fails as a matter of law. As with other § 1983 claims, the "personal involvement of a defendant is a prerequisite to liability" for a due process claim. *Jean-Laurent v. Bowman*, No. 12-CV-2954, 2014 WL 4662221, at *13 (E.D.N.Y. Jul. 7, 2014), *report and recommendation adopted*, 2014 WL 4662232 (E.D.N.Y. Sept. 18, 2014). Here, there is no evidence that Gutierrez ever spoke to the ADA, let alone fabricated or withheld evidence from her.

Therefore, summary judgment as to the § 1983 due process claim will be denied as to Roman and Quinones and granted as to Gutierrez.

**IV. Malicious Prosecution Claims**
In order to prevail on a claim for malicious prosecution pursuant to § 1983, a plaintiff "must establish the elements of a malicious prosecution claim under state law," namely, "(1) the initiation or continuation of a criminal proceeding against plaintiff; (2) termination of the proceeding in plaintiff's favor; (3) lack of probable cause for commencing the proceeding; and (4) actual malice as a motivation for defendants' actions." *Manganiello v. City of New York*, 612 F.3d 149, 160-161 (2d Cir. 2010) (citations and internal quotation marks omitted).

1. Initiation of a Criminal Proceeding and Actual Malice
There is significant overlap between a claim based on malicious prosecution and a due process claim based on fabricated evidence. For purposes of the first element of a malicious prosecution claim, the submission of falsified evidence or withholding of material evidence is deemed to be an "initiation" of a criminal proceeding, *see Dufort*, 874 F.3d at 352-353;

*Manganiello*, 612 F.3d at 163; *Ricciuti*, 124 F.3d at 130; *Stukes v. City of New York*, No. 13-CV-6166, 2015 WL 1246542, at *9 (E.D.N.Y. Mar. 17, 2015); *Levy v. City of New York*, 935 F.Supp.2d 575, 588-589 (E.D.N.Y. 2013); *Myers v. County of Nassau*, 825 F.Supp.2d 359, 367 (E.D.N.Y. 2011), at least where the plaintiff can show that the defendant "knew or should have known" that doing so would cause plaintiff to be prosecuted, *Torres v. Jones*, 26 N.Y.3d 742, 767 (N.Y. 2016). Such conduct also satisfies the element of actual malice. *See id.* at 762 ("[T]he plaintiff may show malice ... with proof that the defendant falsified evidence in bad faith and that, without the falsified evidence, the authorities' suspicion of the plaintiff would not have fully ripened into probable cause").

Here, because a reasonable jury could find both Roman and Quinones liable for a due process violation based on fabricated evidence, *see* Discussion III, *supra*, it could also find that the first and fourth elements of Plaintiff's malicious prosecution claim are satisfied as to these Defendants.

Plaintiff's malicious prosecution claim against Gutierrez, however, fails as a matter of law, as there is no evidence that Gutierrez had any communication with prosecutors or testified before the grand jury. *See Levy*, 935 F.Supp.2d at 588 ("a plaintiff usually cannot show arresting officers initiated a criminal proceeding against him solely based on an arrest"); *Smith v. City of New York*, No. 04-CV-3286, 2010 WL 3397683, at *9 (S.D.N.Y. Aug. 27, 2010) (granting summary judgment as to malicious prosecution claim where "[n]othing in the record suggest[ed] that [the defendant police officer] discussed the arrest with an ADA, or that he testified before the grand jury").

## 2. Probable Cause

*10 Unlike a due process claim based on fabricated evidence, a malicious prosecution claim requires proof that the defendant lacked probable cause to prosecute. However, a lack of probable cause to arrest will necessarily imply a lack of probable cause to prosecute unless new evidence of the plaintiff's culpability is discovered between arrest and prosecution. *See Dufort*, 874 F.3d at 351; *Posr v. Court Officer Shield No. 207*, 180 F.3d 409, 417 (2d Cir. 1999); *Mejia v. City of New York*, 119 F.Supp.2d 232, 254 (E.D.N.Y. 2000). Here, a jury could find that there was no probable cause to arrest Plaintiff, *see* Discussion II.1, *supra*, and that no new evidence of culpability was discovered during the post-arrest period. Although Plaintiff signed a statement during his interrogation admitting that he "saw" Jane Doe, a jury could find, for the reasons previously discussed, that the officers knew this statement to be false, or at least highly dubious. *See* Discussion III, *supra*. Accordingly, this statement, whatever its probative value, did not supply probable cause to initiate criminal proceedings against Plaintiff.

Indictment by a grand jury creates a rebuttable presumption of probable cause under New York law. *See Dufort*, 874 F.3d at 352; *Savino v. City of New York*, 331 F.3d 63, 72 (2d Cir. 2003). "The rule is founded upon the premise that the Grand Jury acts judicially and it may be presumed that it has acted regularly." *Colon v. City of New York*, 60 N.Y.2d 78, 82 (N.Y. 1983); *see also DaCosta*, 281 F.Supp.3d at 305 ("[T]he presumption of probable cause created by a grand jury indictment is premised on the fact that a regularly operating grand jury's decision based on the facts and circumstances should be respected"). However, the presumption that the grand jury has acted "regularly," and hence the basis for deferring to its finding of probable cause, is vitiated if it can be shown that "the indictment was procured by 'fraud, perjury, the suppression of evidence or other police conduct undertaken in bad faith.' " *Dufort*, 874 F.3d at 352 (quoting *Savino*, 331 F.3d at 72); *see also DaCosta*, 281 F.Supp.2d at 304 ("[W]hen evidence of known dubious value—whether a potentially falsified confession, or an unreliable eyewitness identification—is presented to the grand jury, and the grand jury is not apprised of its limited probative value, the presumption of probable cause created by the indictment is rebutted").

Here, any presumption of probable cause generated by the grand jury's indictment is negated by the fact that the grand jury received, and their deliberations were therefore potentially corrupted by, Plaintiff's statement that he "saw" Jane Doe—a statement that the jury could find was passed on by Quinones despite knowledge of its falsity. *See Torres*, 26 N.Y.3d at 767-768 (manufacturing a false statement by plaintiff sufficient to rebut the presumption of probable cause). Furthermore, Plaintiff has "at least established a question of material fact as to whether ... the grand jury [was] aware of the limited nature of [Jane Doe's] identification and the highly suggestive manner in which it was procured." *Dufort*, 874 F.3d at 353. Hence, a genuine dispute of fact exists as to whether the grand jury was deprived of the "complete and full statement of [the] facts" necessary to support the

presumption of probable cause. *DaCosta*, 281 F.Supp.3d at 311 (quoting *Colon*, 60 N.Y.2d at 83); *see Dufort*, 874 F.3d at 353.

Accordingly, summary judgment as to the § 1983 and state law malicious prosecution claims will be denied as to Quinones and Roman and granted as to Gutierrez.

**V. Municipal Liability**

Plaintiff brings a state law malicious prosecution claim against the City of New York. Unlike a claim pursuant to § 1983, a state law malicious prosecution claim may be brought against a municipality under a theory of respondeat superior. *See Bailey v. City of New York*, 79 F.Supp.3d 424, 451 (E.D.N.Y. 2015); *Williams v. City of White Plains*, 718 F.Supp.2d 374, 381 (S.D.N.Y. 2010); *cf. Monell v. Department of Social Services of City of New York*, 436 U.S. 658, 691 (1978). Where genuine issues of material fact exist as to whether individual defendants employed by the City are liable for malicious prosecution, summary judgment with respect to malicious prosecution claims against the City should be denied. *See Sankar v. City of N.Y.*, 867 F.Supp.2d 297, 313 (E.D.N.Y. 2012). Because summary judgment is denied in part as to the malicious prosecution claims against Roman and Quinones, *see* Discussion IV, *supra*, it is also denied as to the state law malicious prosecution claims against the City.

**VI. Qualified Immunity**

*\*11* Defendants argue that they are entitled to summary judgment on grounds of qualified immunity. This argument must be rejected.

"[A] police officer is entitled to qualified immunity where '(1) his conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known, or (2) it was 'objectively reasonable' for him to believe that his actions were lawful at the time of the challenged act." *Jenkins*, 478 F.3d at 87 (quoting *Cerrone v. Brown*, 246 F.3d 194, 199 (2d Cir. 2001) ). It goes without saying that the right to be free of false arrest, malicious prosecution, or deprivations of liberty caused by fabricated evidence are all clearly established constitutional rights. *See Ricciuti*, 124 F.3d at 128, 130.

For purposes of qualified immunity in the context of false arrest claims, "[a]n officer's determination is objectively reasonable if there was 'arguable' probable cause at the time of the arrest—that is, if 'officers of reasonable competence could disagree on whether the probable cause test was met.' " *Jenkins*, 478 F.3d at 87 (quoting *Lennon v. Miller*, 66 F.3d 416, 423 (2d Cir. 1995) ). Defendants contend that, "[e]ven assuming, *arguendo*, that defendants lacked probable cause to arrest plaintiff, the individual defendants are, nonetheless, entitled to qualified immunity ... because his arrest was supported, at a minimum, by arguable probable cause," that is to say, "an officer of reasonable competence could have concluded that the probable cause test had been met." (ECF No. 42 at 8, 10) (citations, internal quotation marks and alterations omitted).

The suggestion that qualified immunity imposes a different standard of "objective reasonableness" than that of probable cause is most curious. Probable cause, as has been stated numerous times by the Supreme Court and the Second Circuit, is already evaluated from the standpoint of an "objectively reasonable police officer." *District of Columbia v. Wesby*, 138 S.Ct. 577, 586 (2018); *Maryland v. Pringle*, 540 U.S. 366, 371 (2003); *United States v. Pabon*, 871 F.3d 164, 174 (2d Cir. 2017), *cert. denied*, 139 S.Ct. 61 (2018); *Mitchell*, 841 F.3d at 77; *Marcavage v. City of New York*, 689 F.3d 98, 109 (2d Cir. 2012), *cert. denied*, 568 U.S. 1212 (2013). Is there any difference between the "objective reasonableness" standard employed in the qualified immunity test and that of a traditional probable cause analysis? Figuring out whether the "officer[ ] of reasonable competence" contemplated for purposes of qualified immunity, *Jenkins*, 478 F.3d at 87; *Lennon*, 66 F.3d at 423, is any different from the "objectively reasonable police officer" contemplated for purposes of probable cause, *Wesby*, 138 S.Ct. at 586; *Pringle*, 540 U.S. at 371, is surely a challenge befitting Alice in Wonderland. [14]

*\*12* "The critical distinction between the probable cause and qualified immunity determination ... is that qualified immunity is reserved for those instances where, even assuming the truth of the facts as submitted by the plaintiff, the allegedly violated right protected under the law is not 'clearly established' in that factual setting." *Jones v. Marcum*, 197 F.Supp.2d 991, 1000 n. 6 (S.D. Ohio 2002); *see also Saucier v. Katz*, 533 U.S. 194, 214-215 (2001) (Ginsburg, J., concurring in the judgment); *Boyce v. Fernandes*, 77 F.3d 946, 948 (7th Cir. 1996) (Posner, J.) ("The modern conception of [qualified] immunity is ... designed to protect public officers from their failures to anticipate changes in the law"). Accordingly, "[w]here the only issue bearing on immunity is whether the defendant had

probable cause to make the search or arrest that is challenged, merits and immunity merge; the dispositive question is simply whether the defendant did have probable cause." *Boyce*, 77 F.3d at 948; *Mahoney v. Kesery*, 976 F.2d 1054, 1057-59 (7th Cir. 1992) (Posner, J.); *Jones*, 197 F.Supp.2d at 1000 n. 6; *Corcoran v. Fletcher*, 160 F.Supp.2d 1085, 1089-1090 (C.D. Cal. 2001).

In this case, there is a genuine dispute of material fact as to probable cause, *see* Discussion II.1, *supra*, and the right allegedly violated was clearly established. Accordingly, Defendants' qualified immunity defense as to the false arrest claim must fail. But even if qualified immunity were to somehow impose a lower standard of reasonableness than probable cause, the result would not be different. The facts set forth above, viewed in the light most favorable to the Plaintiff, could support a finding that no officer of reasonable competence would find probable cause to detain Plaintiff.

Nor are Defendants entitled to qualified immunity with respect to the due process and malicious prosecution claims. As previously explained, these claims are based on conduct which, a jury could find, amounted to the deliberate fabrication of evidence. *See* Discussion III-IV, *supra*. Such conduct, if proven, is unreasonable as a matter of law. *See Ricciuti*, 124 F.3d at 129, 130.

**VII. Plaintiff's Abandoned Claims**
Plaintiff has abandoned all claims against Montagano and all claims against the City, other than the state law malicious prosecution claim discussed above. (ECF No. 47, at 1). Accordingly, summary judgment as to Plaintiff's remaining claims against Montagano and the City is granted.

## CONCLUSION
Defendants' motion for summary judgment with respect to Defendant Roman is **DENIED** as to all claims. The motion with respect to Defendant Gutierrez is **DENIED** as to the false arrest claim and **GRANTED** as to all remaining claims. The motion with respect to Defendant Quinones is **DENIED** as to the due process and malicious prosecution claims and **GRANTED** as to all remaining claims. The motion with respect to Defendant Montagano is **GRANTED** as to all claims. The motion with respect to Defendant the City is **DENIED** as to the state law malicious prosecution claim and **GRANTED** as to all remaining claims.

SO ORDERED.

**All Citations**

Slip Copy, 2019 WL 1099945

**Footnotes**

1        As used herein, "Def. Ex." refers to the exhibits attached to the declaration of Melanie Speight in support of Defendants' motion for summary judgment (ECF No. 44).

2        Both sides rely heavily on complaint follow-up reports, also known as "DD5's," for the truth of the statements made therein. Neither party has objected to the other party's reliance on these DD5's pursuant to Fed. R. Civ. P. 56(c)(2). Accordingly, the Court will treat as waived any argument on hearsay grounds that these DD5 reports may not be considered for purposes of summary judgment. *See Thomsen v. Kefalas*, No. 15-CV-2668, 2018 WL 1508735, at *14 (S.D.N.Y. Mar. 26, 2018).

3        On July 25, 2014, a hearing was held in New York Supreme Court, Kings County, in which the prosecutor described the contents of the video on the record. (Def. Ex. W). Plaintiff heavily relied on this transcript in his opposition papers (ECF No. 47, at 7, 12, 24), and Defendants never objected to it pursuant to Rule 56(c)(2). Accordingly, any argument that this transcript is inadmissible hearsay for summary judgment purposes is waived. *See Thomsen v. Kefalas*, No. 15-CV-2668, 2018 WL 1508735, at *13 (S.D.N.Y. Mar. 26, 2018); *Jones v. Western Tidewater Regional Jail*, 187 F.Supp.3d 648, 654 (E.D. Va. 2016); *Krishtul v. VSLP United, LLC*, No. 10-CV-0909, 2012 WL 13098290, at *7 n. 5 (E.D.N.Y. Jun. 11, 2012).

4

As used herein, "Pl. Ex." refers to the exhibits attached to the declaration of Nicole Bellina in opposition of Defendants' motion for summary judgment (ECF No. 49).

5        11 Stanhope Street was Plaintiff's address at all relevant times. (Grant Dep. at 19:3-4).

6        The following was testified to at Roman's deposition:

Q: Did you show the video to anybody who told you that's Philip Grant?

A: The video and that person said that's Philip Grant?

Q: Yes.

A: I don't recall.

Q: Did you ever show the sketch to anyone who said that looks like Philip Grant?

A: No, not using the name Philip Grant. No.

Q: Did you ever show the sketch to anyone who said that looks like someone at 11 Stanhope Street?

A: No.

(Roman Dep. at 142:5-16).

7        Roman was the only witness who testified to Jane Doe identifying Plaintiff. The day after the arrest, a DD5 report was completed by Gutierrez, corroborating much of Roman's deposition testimony and adding that, after Plaintiff was apprehended, Gutierrez went back to the vehicle, where Jane Doe told her that she was "positive" Plaintiff was her attacker. (Def. Ex. M). Roman did not testify to this confirmatory identification. At Gutierrez's deposition, she claimed that she was unable to remember virtually any details surrounding these events. She testified that she could not remember whether she took any police action in connection with the information received from Darvey (Gutierrez Dep. at 42:9-11), whether she was present during Plaintiff's arrest (*id.* at 42:18-19), or whether Jane Doe ever identified the person who attacked her (*id.* at 44:11-13). Plaintiff's counsel showed Gutierrez a copy of her own DD5 report in an attempt to refresh her recollection; even after this, however, Gutierrez testified that her recollection was not refreshed. (*Id.* at 45:15-20). In light of this testimony, genuine issues of fact exist as to whether this confirmatory identification ever occurred. For summary judgment purposes, this question of fact must be resolved in Plaintiff's favor.

8        In his deposition, Plaintiff refers to certain acts taken by a female detective but does not identify her by name. This female detective is the same one that wrote out Plaintiff's statement and had him sign it. (Grant Dep. at 108:15, 109:5-10). Quinones' DD5 report establishes that she was this detective. (Def. Ex. P).

9        Quinones' DD5 report portrays a conflicting version of this exchange. According to the report, Plaintiff verbally admitted to Quinones that he "saw the white girl," *viz.,* Jane Doe, while running down Evergreen Avenue. (Def. Ex. P). The report does *not* state that this admission was in any way prompted by Quinones. (*Id.*). According to the report, Quinones asked Plaintiff to sign a written statement after this verbal admission. (*Id.*). For summary judgment purposes, to the extent there is a conflict between Quinones' and Plaintiff's accounts, this question of fact must be resolved in Plaintiff's favor.

10      The police report shows that the August 25, 2013 attack occurred at 7:15 p.m. (Pl. Ex. 10). The Court may take judicial notice of the fact that this was before sunset. *See* https://www.timeanddate.com/sun/usa/brooklyn?month=8&year=2013 (accessed Mar. 1, 2019) (sunset in Brooklyn on August 25, 2013 was at 7:38 p.m.).

11      This information appears on a "Complaint Room Screening Sheet" prepared by the ADA, with a notation that the statement was made orally to Quinones.

(Def. Ex. H; Zipkin Dep. at 9:22-24). The statement appears as part of a list of other statements, which the ADA testified were transmitted to her by Roman and Quinones. (Zipkin Dep. 15:13-15). Because this particular statement was made to Quinones, a reasonable trier of fact could infer that it was Quinones who transmitted it to the ADA.

12      Per the ADA's testimony, this statement must have been passed to her by either Roman or Quinones. (Zipkin Dep. at 15:13-15). Because it was Quinones who took Plaintiff's statement, a reasonable trier of fact could infer that it was also she who passed the statement to the ADA.

13      As described above, Roman could not recall anyone identifying Plaintiff based on the video or sketch. (Roman Dep. at 142:5-16). Furthermore, Roman testified that, at the time of Plaintiff's arrest, the sole evidence of his culpability was the victim's identification. (*Id.* at 123:3-7). From this, a reasonable trier of fact, drawing all inferences in Plaintiff's favor, could find that Roman's statement to the ADA was false.

14      " 'When I use a word,' Humpty Dumpty said, in a rather scornful tone, 'it means just what I choose it to mean—neither more nor less.'

        " 'The question is,' said Alice, 'whether you can make words mean so many different things.'

        " 'The question is,' said Humpty Dumpty, 'which is to be master—that's all.' "

        Lewis Carroll, *Through the Looking-Glass* (1871).

---

**End of Document**                              © 2019 Thomson Reuters. No claim to original U.S. Government Works.

WestlawNext © 2019 Thomson Reuters    Thomson Reuters Privacy Policy                    *Thomson Reuters is not providing legal advice*    THOMSON REUTERS

McGrier v. City of New York | WestlawNext
Case 1:19-cv-02441-KAM-RLM Document 1 Filed 04/22/19 Page 41 of 56 PageID #: 44
Page 1 of 14

WESTLAW

McGrier v. City of New York
United States District Court, S.D. New York. March 11, 2019 Slip Copy 2019 WL 1115053 (Approx. 15 pages)

2019 WL 1115053
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Freddie MCGRIER, Plaintiff,
v.
CITY OF NEW YORK, Derek Lynton, Ray Valerio, Robert Henn, Felix
Ramos, Richard Gibson, Daniel Robles, Anthony D'Amato, Thomas
Aasheim, and John Thompson, Defendants.

16-CV-5667 (VEC)
Signed 03/11/2019

### Attorneys and Law Firms

Ellie Amanda Silverman, Novo Law Firm P.C., New York, NY, for Plaintiff.

Carolyn Kay Depoian, Joseph Peter Zangrilli, New York City Law Department, New York,
NY, for Defendants City of New York, Derek Lynton, Ray Valeria, Detective Robert Henn,
Detective Felix Ramos, Lieutenant Richard Gibson, Anthony D'Amato, Daniel Robles.

Joseph Peter Zangrilli, New York City Law Department, New York, NY, for Defendants
Correction Officer Daniel Robles, Robert Henn, Felix Ramos, Richard Gibson.

### OPINION AND ORDER

VALERIE CAPRONI, United States District Judge

*1 Plaintiff Freddie McGrier has sued the City of New York (the "City") and members of the
New York City Police Department ("NYPD"), the New York City Department of Correction
("DOC"), and the Bronx County District Attorney's Office (the "DA's Office") for malicious
prosecution, false arrest, related claims, excessive force, and related claims, pursuant to 42 U.S.C. § 1983
and state law. See Second Amended Complaint ("SAC"), Dkt. 50. Defendants have moved
for summary judgment, pursuant to Federal Rule of Civil Procedure 56. See Defs.' Notice of
Mot., Dkt. 86. For the following reasons, Defendants' motion is GRANTED.

### BACKGROUND[1]

#### I. Plaintiff's Prosecution

##### A. The September 4, 2012 Murder and Investigation
On September 4, 2012, a gas station in the Bronx was robbed at gunpoint. See Def.'s 56.1
Stmt., Dkt. 89, ¶¶ 19–20; Pl.'s 56.1 Stmt., Dkt. 102-7, ¶¶ 19–20. The assailant demanded
money from one of the gas station's attendants, Jason Mwewa, and then shot and killed
another of the gas station's employees. Defs.' 56.1 Stmt. ¶¶ 14, 19–20; Pl.'s 56.1 Stmt. ¶¶
14, 19–20.

The NYPD investigated the murder. The night of the incident, members of the NYPD's 48th
Precinct Detective Squad, including Defendants Robert Henn, Felix Ramos, Richard Gibson,
and Thomas Aasheim, responded to the scene and interviewed Mwewa; in the following
days, they also canvassed the neighborhood, obtained surveillance video from the gas
station, disseminated images of the assailant to the press, and offered a reward for
information about the crime. See Defs.' 56.1 Stmt ¶¶ 15, 17, 18; Pl.'s 56.1 Stmt. ¶¶ 15, 17,
18; Defs.' Ex. G at D161, D164; Pl.'s Ex. A at 95–96; Pl.'s Ex. B at D36–D37, D69, D104.
The NYPD's Crime Scene Unit ("CSU") also collected DNA and other physical evidence.
See Defs.' 56.1 Stmt. ¶¶ 21–23; Pl.'s 56.1 Stmt. ¶¶ 21–23.

A few days after the murder, the owner of a nearby bodega notified the police that he
recognized the assailant as one of his customers, a man named David Baltazar. See Defs.'
56.1 Stmt. ¶ 25; Pl.'s 56.1 Stmt. ¶¶ 25, 97; Defs.' 56.1 Resp. Stmt., Dkt. 105, ¶ 97. The
police arrested Baltazar and placed him in a lineup; Mwewa, however, failed to make an
identification. See Defs.' 56.1 Stmt. ¶¶ 26–27; Pl.'s 56.1 Stmt. ¶¶ 26–27; Defs.' Ex. G at D99,

D106, D171–D174. Accordingly, the police released Baltazar without charging him. *See* Defs.' Ex. G at D106.

Shortly thereafter, two members of the public told the police that Plaintiff had confessed to them to having committed the murder. *See* Defs.' 56.1 Stmt. ¶¶ 28–29; Pl.'s 56.1 Stmt. ¶¶ 28 –29; Defs.' Ex. I at D436–D442. Following this tip, Aasheim showed Mwewa a photo array containing Plaintiff's picture; Mwewa positively identified Plaintiff as the murderer. *See* Defs.' 56.1 Stmt. ¶¶ 30–31; Pl.'s 56.1 Stmt. ¶¶ 30–31.

*2 The police subsequently arrested Plaintiff and placed him in a lineup. *See* Defs.' 56.1 Stmt. ¶ 33; Pl.'s 56.1 Stmt. ¶ 33; Defs.' Ex. G at D118. Mwewa told Ramos that all suspects in the lineup other than Plaintiff were not the murderer, but Mwewa refused definitively to identify Plaintiff as the perpetrator. *See* Defs.' 56.1 Stmt. ¶ 34; Pl.'s 56.1 Stmt. ¶¶ 34, 99; Defs.' 56.1 Resp. Stmt. ¶ 99; Defs.' Ex. G at D184; Defs.' Reply Ex. J-2, Dkt. 104-1, at 13 –14. During this time, Mwewa was "sweating heavily," and Ramos believed that he had refused to identify Plaintiff out of fear. Defs.' Ex. J at 15; *see also* Defs.' 56.1 Stmt. ¶¶ 35–36; Pl.'s 56.1 Stmt. ¶¶ 35–36.

**B. Plaintiff's Charges and Trial**
Following Plaintiff's lineup, Ramos contacted prosecutors in the DA's Office and discussed the evidence that the police had gathered against Plaintiff. *See id.* The DA's Office told the police to charge Plaintiff with the murder. *See id.* at 24; *see also* Defs.' Ex. G at D118. Plaintiff was subsequently arrested and indicted for murder, robbery, and criminal possession of a weapon. *See* Defs.' 56.1 Stmt. ¶ 41–42; Pl.'s 56.1 Stmt. ¶ 41–42.

Plaintiff was tried and acquitted on these charges in October 2015. *See* Defs.' 56.1 Stmt. ¶ 46, 49; Pl.'s 56.1 Stmt. ¶ 46, 49. At trial, Mwewa testified and identified Plaintiff as the murderer. *See* Defs.' 56.1 Stmt. ¶¶ 47–48; Pl.'s 56.1 Stmt. ¶¶ 47–48. Additionally, one of the informants who had tipped off the police about Plaintiff also testified. *See* Defs.' Ex. I at 221 –27.

**II. Plaintiff's Incarceration**
Between September 2012 and October 2015, Plaintiff was detained pending trial at the Rikers Island prison complex. *See* Defs.' 56.1 Stmt. ¶ 50; Pl.'s 56.1 Stmt. ¶ 50.

**A. The July 15, 2013 Cell Extraction**
In July 2013, Plaintiff was housed in a solitary unit at Rikers Island known as the Central Punitive Segregation Unit ("CPSU"). *See* Defs.' 56.1 Stmt. ¶ 60; Pl.'s 56.1 Stmt. ¶ 60. Plaintiff's cell door contained a small slot, known as a "cuffing port," through which inmates are handcuffed before leaving their cells and after being returned to their cells. *See* Defs.' 56.1 Stmt. ¶ 61; Pl.'s 56.1 Stmt. ¶ 61. On July 15, 2013, Plaintiff placed his hands into the cuffing port, preventing it from closing. *See* Defs.' 56.1 Stmt. ¶ 62; Pl.'s 56.1 Stmt. ¶ 62. Plaintiff testified in his deposition that he was "trying to get out of [his] cell" at the time. Defs.' 56.1 Stmt. ¶ 63; Pl.'s 56.1 Stmt. ¶ 63. Inmates who place their hands into the cuffing ports pose a safety concern because of the risk that they could be holding a weapon or preparing to throw objects out of the cell; accordingly, when an inmate prevents a cuffing port from closing, the entire unit is locked down until the prisoner's hand is removed. *See* Defs.' Ex. C at 41–42.

Corrections officers ordered Plaintiff to remove his hand from the cuffing port, but Plaintiff refused. *See* Defs.' 56.1 Stmt. ¶¶ 64, 67; Pl.'s 56.1 Stmt. ¶¶ 64, 67. After a mental health professional spoke with Plaintiff, corrections officers assembled an extraction team. *See* Defs.' 56.1 Stmt. ¶ 66; Pl.'s 56.1 Stmt. ¶ 66. Although the extraction team, which included Defendant Daniel Robles, repeatedly sprayed Plaintiff with a chemical agent through the cuffing port, Plaintiff still refused to remove his hand. *See* Defs.' 56.1 Stmt. ¶¶ 59, 68; Pl.'s 56.1 Stmt. ¶¶ 59, 68; Defs.' Ex. Q at 8:15-9:12. The extraction team then attempted to enter Plaintiff's cell, led by an officer carrying a shield. *See* Defs.' 56.1 Stmt. ¶ 70; Pl.'s 56.1 Stmt. ¶ 70. Plaintiff charged the shield, preventing the team from entering the cell. *See* Defs.' 56.1 Stmt. ¶ 71; Defs.' Ex. Q at 9:00–9:45. The team pushed past Plaintiff and entered the cell. *See* Defs.' 56.1 Stmt. ¶ 72; Defs.' Ex. Q at 9:40–9:55.

*3 What happened inside Plaintiff's cell is a matter of dispute. According to Defendants, Plaintiff forcibly resisted while Robles and the other officers attempted to handcuff him. *See* Defs.' 56.1 Stmt. ¶ 73. According to Plaintiff, he did not resist the officers, and they punched and kicked him after he was handcuffed. *See* Pl.'s Mem. of Law, Dkt. 101, at 6, 20–21. Plaintiff asserts that he suffered permanent visual impairment from this incident, *see* Pl.'s 56.1 Stmt. ¶ 76 (citing Pl.'s Ex. C at 223); citing medical records, Defendants assert that

Case 1:19-cv-02441-KAM-LB   Document 1   Filed 04/22/19   Page 43 of 56 PageID #: 43

Plaintiff suffered no visual impairment, *see* Defs.' 56.1 Stmt. ¶ 76 (citing Defs.' Exs. Q, R). [3] Although these facts are disputed, the dispute is not material.

**B. The October 12, 2013 Slip-and-Fall**
On October 12, 2013, Plaintiff slipped on a wet floor in the shower area of Rikers Island. *See* Defs.' 56.1 Stmt. ¶ 81; Pl.'s 56.1 Stmt. ¶¶ 81, 116; Defs.' Resp. Stmt. ¶ 116. Plaintiff was handcuffed and being led out of the shower area by a corrections officer at the time. *See* Pl.'s 56.1 Stmt. ¶¶ 117–118; Defs.' 56.1 Resp. Stmt. ¶¶ 117–118.

## DISCUSSION

**I. Standard of Review**
Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986) ). Courts "construe the facts in the light most favorable to the non-moving party and ... resolve all ambiguities and draw all reasonable inferences against the movant." *Delaney v. Bank of Am. Corp.*, 766 F.3d 163, 167 (2d Cir. 2014) (per curiam) (quoting *Aulicino v. N.Y.C. Dep't of Homeless Servs.*, 580 F.3d 73, 79–80 (2d Cir. 2009) ).

**II. All Claims Against Aasheim, Thompson, Lynton, and Valerio Are Dismissed**
Before turning to the merits of Plaintiff's claims, several Defendants warrant dismissal as a matter of law. First, Thomas Aasheim, a police officer, and John Thompson, a corrections officer, were never served with process, despite having been named as Defendants more than 18 months ago. *See* Defs.' 56.1 Stmt. ¶¶ 6–7. Over a year ago, this Court specifically told Plaintiff to serve these parties promptly, *see* Tr. of Nov. 3, 2017 Conf. at 2; inexplicably, Plaintiff failed to do so. In his response to Defendants' motion for summary judgment, Plaintiff acknowledges that these Defendants were never served, and Plaintiff offers no explanation—let alone any good cause—for the failure to serve. *See* Pl.'s 56.1 Stmt. ¶¶ 6–7. Accordingly, all claims against Aasheim and Thompson are DISMISSED for failure to serve. *See* Fed. R. Civ. P. 4(m).

Plaintiff also sued two Assistant District Attorneys ("ADAs"), Derek Lynton and Ray Valerio. Because Lynton and Valerio are entitled to absolute immunity, *see* Defs.' Mem. of Law, Dkt. 88, at 18–21, Plaintiff has agreed to dismiss these Defendants, *see* Pl.'s Mem. of Law at 1, 8 n.4. Accordingly, all claims against Lynton and Valerio are DISMISSED. [4]

*4 Additionally, Plaintiff sued Anthony D'Amato, a police officer, for, *inter alia*, malicious prosecution and false arrest. The parties agree that D'Amato's only involvement in Plaintiff's prosecution was to collect DNA evidence from the murder scene, *see* Defs.' 56.1 Stmt. ¶ 24; Pl.'s 56.1 Stmt. ¶ 24; thus, Plaintiff has agreed to dismiss all claims against D'Amato, *see* Pl.'s Mem. of Law at 8 n.4. Accordingly, all claims against D'Amato are DISMISSED. [5]

**III. Defendants' Motion for Summary Judgment Is Granted on Plaintiff's Claims Relating to His Arrest and Prosecution for Murder**
Plaintiff brings a number of claims against Henn, Ramos, and Gibson (the "Police Defendants") in connection with his arrest and prosecution, including claims for malicious prosecution, "deprivation of rights," false arrest, wrongful imprisonment, negligent prosecution, failure to intervene, and intentional infliction of emotional distress ("IIED"), pursuant to § 1983 and New York State law. *See* SAC ¶¶ 111–131, ¶¶ 144–173. The Police Defendants move for summary judgment on these claims.

**A. Malicious Prosecution**

### 1. The Applicable Law
"In order to prevail on a § 1983 claim against a state actor for malicious prosecution, a plaintiff must show a violation of his rights under the Fourth Amendment and must establish the elements of a malicious prosecution claim under state law." *Manganiello v. City of New York*, 612 F.3d 149, 160–61 (2d Cir. 2010) (citations omitted) (collecting cases). "To establish a malicious prosecution claim under New York law, a plaintiff must prove '(1) the initiation or continuation of a criminal proceeding against plaintiff; (2) termination of the proceeding in plaintiff's favor; (3) lack of probable cause for commencing the proceeding; and (4) actual malice as a motivation for defendant's actions.' " *Id.* (quoting *Murphy v. Lynn*, 118 F.3d 938, 947 (2d Cir. 1997) ).

### 2. Henn, Ramos, and Gibson Did Not "Initiate" Criminal Proceedings Against Plaintiff

"To initiate a prosecution, a defendant must do more than report the crime or give testimony. He must 'play[ ] an active role in the prosecution, such as giving advice and encouragement or importuning the authorities to act.' " *Manganiello*, 612 F.3d at 163 (quoting *Rohman v. N.Y.C. Transit Auth.*, 215 F.3d 208, 217 (2d Cir. 2000) ). Merely "reporting ... a crime" or "giving testimony" is insufficient to establish this element. *Rohman*, 215 F.3d at 217 (collecting cases). Rather, the plaintiff must show that the defendant "distorted the process by which plaintiff was brought to trial," such as by "creat[ing] false information and forward [ing] it to prosecutors" or by withholding "relevant and material information" from prosecutors. *Breeden v. City of New York*, No. 09–CV–4995, 2014 WL 173249, at *10 (E.D.N.Y. Jan. 13, 2014); *see also Manganiello*, 612 F.3d at 160; *Bailey v. City of New York*, 79 F. Supp. 3d 424, 448–49 (E.D.N.Y. 2015) (collecting cases).

*5 Plaintiff points to no evidence in the record from which a reasonable juror could infer that any of the Police Defendants initiated Plaintiff's prosecution. Plaintiff's prosecution was initiated shortly after he appeared in a lineup, after Ramos called a prosecutor in the DA's Office, notified him of the evidence against Plaintiff, and received an instruction to charge Plaintiff with the murder. *See* Defs.' Ex. J at 24 (Ramos deposition testimony that "[a]fter conferring with the District Attorney, we were informed to make an arrest in this case.... [W]e were told to go forward and make an arrest."); *see also* Defs.' Ex. G at D118 (police report stating that Plaintiff was charged with homicide after a "conferral" between an assistant district attorney and the homicide supervisor in the DA's Office).[6] As to Ramos, therefore, Plaintiff's claim fails, as the record contains no evidence that Ramos did anything except report the results of his investigation to prosecutors and allow them to decide whether to charge Plaintiff with the murder. *See Rohman*, 215 F.3d at 217 ("[t]he mere reporting of a crime" is insufficient to establish the "initiation" of a prosecution); *Bailey*, 79 F. Supp. 3d at 449; *Breeden*, 2014 WL 173249, at *10; *Present v. Avon Prods., Inc.*, 253 A.D.2d 183, 189 (1st Dep't 1999) ("One who does no more than disclose to a prosecutor all material information within his knowledge is not deemed to be the initiator of the proceeding."). As to Henn and Gibson, Plaintiff's claim also fails, as he offers no evidence whatsoever that they participated in calls with the DA's Office, filled out corroborating affidavits, or otherwise played "an active role in the prosecution." *Manganiello*, 612 F.3d at 163.

Plaintiff argues that the Police Defendants "distorted" the process with which Plaintiff was prosecuted by misrepresenting and withholding relevant information from prosecutors. Pl.'s Mem. of Law at 11. First, Plaintiff argues that the Police Defendants failed to investigate—and thus withheld from prosecutors—Plaintiff's "alibi," that is, a statement that he made to the Police Defendants that he was in Manhattan on the night of the murder (which took place in the Bronx). *See id.* at 8–10; Pl.'s 56.1 Stmt. ¶ 113. Plaintiff's argument fails. After hearing Plaintiff's "alibi," the Police Defendants obtained his cell phone records, which showed that he was in the Bronx, not Manhattan, on the night of the murder. *See* Defs.' 56.1 Resp. Stmt. ¶ 113 (citing Pl.'s Ex. A at 50). Because they investigated and debunked this "alibi," no reasonable juror could infer that the Police Defendants "distorted" Plaintiff's prosecution by failing to investigate his alibi.[7]

Plaintiff also argues that the Police Defendants withheld from prosecutors the fact that Plaintiff was "four inches taller" and darker-skinned than the description of the perpetrator that Mwewa provided on the night of the murder. Pl.'s Mem. of Law at 2, 10; Pl.'s 56.1 Stmt. ¶¶ 90, 96, 101. Plaintiff again mischaracterizes the record. Both Mwewa's description and Plaintiff's actual appearance were documented in the police's case file, which the Police Defendants turned over to prosecutors. *See* Defs.' Ex. G at D41, D182; Defs.' Ex. K at D1; Pl.'s Ex. U, Dkt. 104-2, at 19. Plaintiff is, therefore, incorrect that the Police Defendants withheld this information. In any event, these slight differences from Mwewa's description carry little to no investigative value, considering that Mwewa subsequently identified Plaintiff in a photo array (which Plaintiff does not argue was suggestive or otherwise unfair).[8] *See* Defs.' 56.1 Stmt. ¶ 31; Pl.'s 56.1 Stmt. ¶ 31.

*6 Additionally, Plaintiff argues that Ramos's description of his lineup to prosecutors was not "balanced [and] unbiased" because Ramos unfairly "jumped to the conclusion" that Mwewa was too frightened to identify Plaintiff. Pl.'s Mem. of Law at 10–11; *see also id.* at 3–4. But Plaintiff points to no evidence that Ramos lied, exaggerated, or otherwise mischaracterized what happened at the lineup to the prosecutors; to the contrary, all aspects of the lineup were documented in the police's case file, including Mwewa's statements and body language during the procedure.[9] *See* Defs.' Ex. G at D182–D186.

Finally, Plaintiff argues that the Police Defendants failed to conduct searches and canvasses to determine whether Plaintiff possessed a bicycle or a blue hoodie, both of which were used by the assailant when he robbed the gas station. *See* Pl.'s Mem. of Law at 4, 10–11; Pl.'s 56.1 Stmt. ¶¶ 102–104. Plaintiff's assertions again have no basis in the record. The police's case file indicates that numerous canvasses of the neighborhood surrounding the gas station were conducted in the days following the murder. *See* Pl.'s Ex. B at D36–D37. Although the police did not recover the bicycle or hoodie, nor did they search Plaintiff's residence for these objects, *see* Pl.'s 56.1 Stmt. ¶¶ 102, 104; Defs.' 56.1 Resp. Stmt. ¶¶ 102, 104, that hardly vitiates the probable cause for Plaintiff's prosecution (given the likelihood that a savvy perpetrator would have discarded these items). *See Panetta v. Crowley*, 460 F.3d 388, 396 (2d Cir. 2006) ("[O]nce a police officer has a reasonable basis for believing there is probable cause, he is not required to explore and eliminate every theoretically plausible claim of innocence before making an arrest." (quoting *Curley v. Village of Suffern*, 268 F.3d 65, 70 (2d Cir. 2001) ) ). In any event, given that the police's case file was turned over to the DA's Office, there is no indication that the Police Defendants lied to prosecutors about the absence of this evidence or otherwise distorted the evidence against Plaintiff.

For all these reasons, no reasonable juror could find that any of the Police Defendants initiated Plaintiff's prosecution.

### 3. There Was Probable Cause for Plaintiff's Prosecution

"Probable cause requires an officer to have 'knowledge or reasonably trustworthy information sufficient to warrant a person of reasonable caution in the belief that an offense has been committed by the person to be arrested.' " *Panetta*, 460 F.3d at 395 (quoting *Martinez v. Simonetti*, 202 F.3d 625, 634 (2d Cir. 2000) (citation omitted) ). Although probable cause "does not require absolute certainty," *id.* (quoting *Boyd v. City of New York*, 336 F.3d 72, 76 (2d Cir. 2003) ), "an officer may not disregard plainly exculpatory evidence" in the course of an investigation, *id.* (citing *Kerman v. City of New York*, 261 F.3d 229, 241 (2d Cir. 2001) ). "[T]he existence of probable cause is a complete defense to a claim of malicious prosecution in New York." *Manganiello*, 612 F.3d at 161–62 (quoting *Savino v. City of New York*, 331 F.3d 63, 72 (2d Cir. 2003) ).

An "indictment by a grand jury creates a presumption of probable cause." *Id.* "That presumption may be rebutted only 'by evidence that the indictment was procured by fraud, perjury, the suppression of evidence or other police conduct undertaken in bad faith.' " *Id.* (quoting *Savino*, 331 F.3d at 72); *see also Rothstein v. Carriere*, 373 F.3d 275, 284 (2d Cir. 2004).

\*7 Plaintiff was indicted by a grand jury in September 2012. *See* Defs.' 56.1 Stmt. ¶ 42; Pl.'s 56.1 Stmt. ¶ 42. Plaintiff offers no evidence to rebut the presumption of probable cause, other than his arguments that the Police Defendants "withheld" evidence about Plaintiff's alibi, the differences between Mwewa's description and Plaintiff's appearance, and the failure of police to find the perpetrator's bicycle and hoodie. *See* Pl.'s Mem. of Law at 14. As the Court has discussed, these arguments have no basis in the record. Even if they did, they would not rebut the presumption that Plaintiff's prosecution was supported by probable cause. *See Hayes v. City of New York*, No. 12-CV-4370, 2014 WL 4626071, at *10 (S.D.N.Y. Sept. 15, 2014) ("a purportedly inadequate investigation" does not rebut an indictment's presumption of probable cause).

Even if Plaintiff had not been indicted, there would have been more than enough evidence to establish probable cause for his prosecution. After two informants told the police that Plaintiff was responsible for the murder, Mwewa identified Plaintiff from a photo array. Because Mwewa was an innocent "bystander with no apparent motive to falsify," his identification carried "a peculiar likelihood of accuracy." *Panetta*, 460 F.3d at 395 (quoting *Caldarola v. Calabrese*, 298 F.3d 156, 163 (2d Cir. 2002) ). It is well-established that "[a] positive photo identification by an eyewitness is normally sufficient to establish probable cause to arrest." *Celestin v. City of New York*, 581 F. Supp. 2d 420, 431 (E.D.N.Y. 2008) (collecting cases); *see also Panetta*, 460 F.3d at 395.[10]

Plaintiff argues that any probable cause "dissipated" after Mwewa failed to identify him in the lineup. *See* Pl.'s Mem. of Law at 13–14. In order for probable cause to dissipate, however, "the groundless nature of the charges must be made apparent by the discovery of some intervening fact." *Lowth v. Town of Cheektowaga*, 82 F.3d 563, 571 (2d Cir. 1996) (citing *Callan v. State*, 73 N.Y.2d 731 (1988) ). Although Mwewa did not positively identify Plaintiff during the lineup, he excluded all other suspects in the lineup and appeared visibly

frightened during the procedure. Under these circumstances, Mwewa's non-identification did not come close to showing that Plaintiff's prosecution was "groundless."

Plaintiff also argues that lapses in the police's DNA-collection procedures caused probable cause to dissipate. *See* Pl.'s Mem. of Law at 2, 15. When the police first processed the crime scene, they collected a number of DNA samples, but they failed to swab the inside of Mwewa's pants pockets for DNA; because the assailant had rifled through the pants pockets, he could possibly have left DNA evidence in them. *See* Defs.' 56.1 Stmt. ¶ 23; Pl.'s 56.1 Stmt. ¶¶ 23, 105; Defs.' 56.1 Resp. Stmt. ¶ 105. Gibson testified in his deposition that the police should have collected DNA from the pants pockets. *See* Pl.'s Ex. A at 84–85. As the Court has stated, however, "a purportedly inadequate investigation" does not vitiate probable cause. *Hayes*, 2014 WL 4626071, at *10; *see also Panetta*, 460 F.3d at 395–96 ("Although a better procedure may [be] for the officers to investigate plaintiff's version of events more completely, the arresting officer does not have to prove plaintiff's version wrong before arresting him. Nor does it matter that an investigation might have cast doubt upon the basis for the arrest." (quoting *Curley*, 268 F.3d at 70) ).[11]

*8 Additionally, in mid-2015, the City's Office of the Chief Medical Examiner excluded Plaintiff as a contributor from all DNA samples from the crime scene "where comparisons could be made." Def.'s 56.1 ¶ 44; Pl.'s 56.1 ¶¶ 44, 115; Def.'s 56.1 Resp. ¶ 115. In Plaintiff's view, this evidence established that the charges against him were groundless. *See* Pl.'s Mem. of Law at 15. But these DNA results were obtained nearly three years after Plaintiff's arrest and indictment; by that time, "custody of the case [had been] transferred from the police to prosecutors." *Fappiano v. City of New York*, No. 01-CV-2476, 2015 WL 94190, at *14 (E.D.N.Y. Jan. 7, 2015), *aff'd*, 640 F. App'x 115 (2d Cir. 2016); *see also Bernard v. United States*, 25 F.3d 98, 104 (2d Cir. 1994) ("Once the grand jury indicted [the plaintiff], control of the prosecution passed to the prosecutor and was no longer within the agent's authority."). Thus, "[e]ven assuming *arguendo* that probable cause can 'dissipate' after the grand jury indictment has been filed," the Police Defendants would not be liable for failing to further investigate after the DNA results were returned because the Police Defendants did not have "control over [Plaintiff's] case" at the time. *Fappiano*, 2015 WL 94190, at *14 (quoting *Wilson v. City of New York*, 480 F. App'x 592, 595 (2d Cir. 2012) ); *see also Panetta*, 460.F.3d at 395 ("When determining whether probable cause exists courts must consider those facts *available to the officer* at the time of the arrest and immediately before it." (emphasis in original) (quoting *Calderola*, 298 F.3d at 162) ); *Bernard*, 25 F.3d at 104.[12]

Finally, Plaintiff relies on his expert witness's opinion that the Police Defendants "violated accepted and standard police practices and procedures" in connection with Plaintiff's investigation and that "[n]o responsible police officer could have concluded that there was probable cause" to prosecute Plaintiff. Pollini Decl. ¶¶ 40–41. This witness's opinion does not change the Court's analysis. Plaintiff offers no argument why the failure to follow best-practice procedures vitiates probable cause; as the Court has explained, the law is to the contrary. *See Panetta*, 460 F.3d at 395–96; *Hayes*, 2014 WL 4626071, at *10. In any event, whether probable cause exists is a question of law for the Court, not an expert witness.

For all these reasons, no reasonable juror could find that Plaintiff's prosecution lacked probable cause. Accordingly, Defendants' motion for summary judgment is granted as to Plaintiff's § 1983 and state-law claims for malicious prosecution.

**B. Plaintiff's Other Claims Relating to His Arrest and Prosecution for Murder**
Defendants' motion for summary judgment is also granted as to the balance of Plaintiff's claims relating to his arrest and prosecution. As to Plaintiff's claims for false arrest and wrongful imprisonment, probable cause is a complete defense, *see Jenkins v. City of New York*, 478 F.3d 76, 84 (2d Cir. 2007); *Arum v. Miller*, 331 F. Supp. 2d 99, 109 (E.D.N.Y. 2004); thus, these claims fail for the reasons described *supra*. As to the claims for deprivation of rights and negligent prosecution, Defendants moved for summary judgment on these claims, *see* Defs.' Mem. of Law at 6, 30–31, but Plaintiff failed to address these claims in his response papers; accordingly, Plaintiff has abandoned these claims. *See Camarda v. Selover*, 673 F. App'x 26, 30 (2d Cir. 2016); *Jackson v. Federal Express*, 766 F.3d 189, 195 (2d Cir. 2014). In addition, "deprivation of rights" and "negligent prosecution" are not recognized causes of action under either § 1983 or New York law. *See Patterson v. Cty. of Oneida*, 375 F.3d 206, 225 (2d Cir. 2004); *Mitchell v. Cty. of Nassau*, No. 05-CV-4957, 2007 WL 1580068, at *13 (E.D.N.Y. May 24, 2007). Accordingly, Defendants' motion for summary judgment is granted on these claims, too.

McGriff v. City of New York | WestlawNext
Case 1:19-cv-02441-KAM-LB Document 1 Filed 04/22/19 Page 47 of 56 PageID # 47
Page 7 of 14

*9 As to Plaintiff's claim for failure to intervene, that claim requires proof that the defendant had reason to know of a constitutional violation committed by a law enforcement individual. *See Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994). As the Court has discussed, no reasonable juror could find that Plaintiff suffered a constitutional violation with respect to his arrest and prosecution; thus, the claim for failure to intervene fails. Additionally, Plaintiff's response papers address this claim only in the context of his claim for excessive force (which arises out of the July 15, 2013 cell extraction), not his claim for malicious prosecution; accordingly, Plaintiff has abandoned his claim for failure to intervene with respect to the prosecution.

Finally, Plaintiff's claim for IIED requires proof of "severe emotional distress," that is, distress "so severe that no reasonable [person] could be expected to endure it." *Medcalf v. Walsh*, 938 F. Supp. 2d 478, 490 (S.D.N.Y. 2013) (quoting *Wiener v. Unumprovident Corp.*, 202 F. Supp. 2d 116, 122 (S.D.N.Y. 2002) ); *see also Howell v. New York Post Co.*, 81 N.Y.2d 115, 121 (1993); *Allam v. Meyers*, 906 F. Supp. 2d 274, 282–83 (S.D.N.Y. 2012) (collecting cases); *Pepe v. Maklansky*, 67 F. Supp. 2d 186, 187 n.1 (S.D.N.Y. 1999). Plaintiff offers no evidence that he suffered severe emotional distress; instead, Plaintiff requests an opportunity to submit supplemental briefing on the matter using expert testimony. *See Pl.'s Mem. of Law at 27–28. Expert discovery, however, closed months before Defendants filed their motion for summary judgment. *See Order (Feb. 2, 2018), Dkt. 80 (order requiring that expert discovery on all subjects other than damages be completed by April 30, 2018).

Plaintiff provides no excuse for failing to conduct expert discovery on this matter.[12] And, in any event, Plaintiff offers no non-expert evidence to prove emotional distress, such as testimony from Plaintiff or Plaintiff's medical records. Accordingly, based on the present record, no reasonable juror could find that Plaintiff suffered severe emotional distress; thus, Defendant's motion for summary judgment is granted as to Plaintiff's IIED claim.

For all the foregoing reasons, Defendants' motion for summary judgment is granted on all of Plaintiff's claims relating to his arrest and prosecution, including the claims for malicious prosecution, deprivation of rights, false arrest, wrongful imprisonment, negligent prosecution, failure to intervene, and IIED.

### IV. Defendants' Motion for Summary Judgment Is Granted on Plaintiff's Claims Relating to the July 15, 2013 Cell Extraction

*10 Plaintiff sued Robles for excessive force and failure to intervene, pursuant to § 1983 and New York State law, in connection with the July 15, 2013 incident in which Plaintiff was extracted from his cell on Rikers Island. *See SAC ¶¶ 150–158, 174–189. Robles moves for summary judgment on these claims.

"[T]he right of pretrial detainees to be free from excessive force amounting to punishment is protected by the Due Process Clause of the Fourteenth Amendment," and, thus, may form the basis of a § 1983 claim. *United States v. Walsh*, 194 F.3d 37, 47 (2d Cir. 1999) (citing *Bell v. Wolfish*, 441 U.S. 520, 535 (1979) ). In order to hold a defendant liable on such a claim, a plaintiff must show that the defendant was personally involved in the constitutional violation. *See Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995) ("It is well-settled in this Circuit that 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " (quoting *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) ) ); *see also Provost v. City of Newburgh*, 262 F.3d 146, 155 (2d Cir. 2001); *Sash v. United States*, 674 F. Supp. 2d 531, 542 (S.D.N.Y. 2009) (collecting cases).

A plaintiff may show "personal involvement" by, among other things, showing that the defendant "direct[ly] participated" in the violation, that is, that the defendant intentionally participated "in the conduct constituting a violation of the victim's rights" and that he "knew of the facts rendering it illegal." *Provost*, 262 F.3d at 155 (footnote omitted). Alternatively, the plaintiff may show that the defendant failed to intervene to protect the plaintiff from a violation of his constitutional rights by another person. *See Anderson*, 17 F.3d at 557. In order to establish liability for failure to intervene, the plaintiff must show, among other things, that the defendant had "a realistic opportunity to intervene to prevent the harm from occurring." *Id.*

Plaintiff argues that corrections officers used excessive force against him during the July 15, 2013 cell extraction because they kicked and punched him after he was handcuffed. *See Pl.'s Mem. of Law at 6, 20–22. This incident involved a team of six or more corrections officers. *See Defs.' 56.1 Stmt. ¶¶ 70, 74; Defs.' Ex. Q at 00:50–1:45. Plaintiff, however, has not sued all of the corrections officers involved; he has sued only one, Daniel Robles. *See Defs.' 56.1 Stmt. ¶ 59; Pl.'s 56.1 Stmt. ¶ 59. Even assuming that Plaintiff's allegations are

true, Plaintiff has offered no evidence that Robles, as opposed to one of the other officers, punched and kicked him. See Pl.'s Mem. of Law at 6, 20–22; Defs.' 56.1 Stmt. ¶ 74; Pl.'s 56.1 Stmt. ¶ 74. Nor has Plaintiff offered any explanation why he sued Robles but did not—after extensive discovery and two amended complaints—sue any of the other members of the extraction team. See Defs.' 56.1 Stmt. ¶ 59; Pl.'s 56.1 Stmt. ¶ 59. Because the record contains no evidence from which a reasonable juror could infer that Robles is personally responsible for any deprivation of Plaintiff's constitutional rights, Robles's motion for summary judgment is granted.

Turning to the evidence that is in the record, Plaintiff testified in his deposition that an unspecified number of officers "hit" and "kicked" him, but Plaintiff did not offer any other details about the incident in his testimony (or, at least, in the portions of his testimony that were submitted to this Court). Defs.' Ex. D at 218; Pl.'s Ex. C at 217. Plaintiff did not submit an affidavit or declaration clarifying this vague testimony. Although Robles was deposed, he could not remember anything about the incident. See Pl.'s Ex. D. Amazingly, Plaintiff failed to depose any of the other corrections officers who were involved in the incident (or, at least, Plaintiff did not include any of their deposition testimony in his response to Defendants' motion for summary judgment). [14] Finally, although the extraction incident was captured on video, the video does not make clear which (if any) officers punched or kicked Plaintiff, as the officers were all surrounding Plaintiff in a huddle during this time. See Defs.' Ex. Q at 9:30–10:45. In short, Plaintiff has offered no evidence tending to show that it was Robles who punched or kicked him, other than Robles's presence at the scene with at least five other officers. As to those other officers, Plaintiff has offered no evidence whatsoever to distinguish Robles's actions from theirs. See Defs.' 56.1 Stmt. ¶ 59; Pl.'s 56.1 Stmt. ¶ 59 (Plaintiff admits that "[t]he only individually named defendant in this case who was involved in the July 15, 2013 incident is Daniel Robles"); id. ¶ 74 (Plaintiff offers no evidence to dispute that he "cannot identify what specific actions ... Robles took against him"). Essentially, Plaintiff—without any rhyme or reason—has picked Robles's name out of a hat and selected him as the person who should be held responsible for the July 15, 2013 incident. Under these circumstances, Robles is entitled to summary judgment. [15]

*11 The Court is mindful that plaintiff's are permitted to prove their cases—and to defeat summary judgment—exclusively through circumstantial evidence. Indeed, in other § 1983 cases, courts have denied summary judgment when the plaintiff offered some circumstantial evidence that the defendant caused his injuries, even if the plaintiff could not definitively say who was responsible. [16] Here, however, Plaintiff has failed to offer *any* facts tending to show that it was Robles who punched or kicked him while he was handcuffed, other than Robles's presence at the scene. Based on this record, no reasonable juror could find, by a preponderance of the evidence, that Robles assaulted Plaintiff. See Rasmussen, 766 F. Supp. 2d at 411–12; cf. Burley v. Gagacki, 729 F.3d 610, 620 (6th Cir. 2013) ("As a general rule, mere presence at the scene of a search, without a showing of direct responsibility for the action, will not subject an officer to liability.").

Nor could any reasonable juror find Robles liable pursuant to a failure-to-intervene theory. That theory requires Plaintiff to prove that Robles had "a realistic opportunity to intervene to prevent the harm from occurring." Anderson, 17 F.3d at 557. Whether, as a matter of law, a defendant had a realistic opportunity to intervene turns on the duration of the alleged assault, "the number of officers present, their relative placement, the environment in which they acted, [and] the nature of the assault," among other factors. Figueroa v. Mazza, 825 F.3d 89, 107–08 (2d Cir. 2016). Plaintiff offers no evidence about these details. See Defs.' Ex. D at 218; Pl.'s Ex. C at 217. He fails to explain, for example, whether the punches and kicks occurred "in rapid succession," in which case Robles would not have had an opportunity to intervene as a matter of law, O'Neill v. Krzeminski, 839 F.2d 9, 11–12 (2d Cir. 1988), or whether the assault was "an extended sequence of events during which a bystander could have intervened and prevented further harm," Burks v. City of New York, No. 17-CV-177, 2018 WL 6199550, at *6 (E.D.N.Y. Nov. 28, 2018). Because Plaintiff would bear the burden of proving at trial that Robles had a realistic opportunity to intervene, Plaintiff's failure to offer evidence on this point is fatal. See Celotex, 477 U.S. at 322. [17]

*12 Plaintiff defends his failure to proffer evidence of Robles's involvement on the ground that Plaintiff "was not asked during his deposition if he remembered specific actions ... [that] Robles took against him." Pl.'s 56.1 Stmt. ¶ 74. This argument is meritless. Because Defendant submitted a proper motion for summary judgment, Plaintiff bears the burden of "set[ting] forth specific facts showing that there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986); see also id. at 257 ("[T]he plaintiff must

present affirmative evidence in order to defeat a properly supported motion for summary judgment."). As is often said, "[t]he mere existence of a scintilla of evidence" is insufficient to make this showing; "there must be evidence on which the jury could reasonably find for the plaintiff." *id.* at 252; *see also id.* at 249–50 ("If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." (citations omitted) ); *see also Celotex,* 477 U.S. at 322. Plaintiff has utterly failed to put forward any probative evidence that Robles violated his constitutional rights. [18]

For all these reasons, Defendants motion for summary judgment is granted on Plaintiff's § 1983 claim for excessive force. [19]

**V. Plaintiff Is Ordered to Show Cause Why the Claim Relating to His October 12, 2013 Slip-and-Fall Should Not Be Dismissed for Lack of Subject-Matter Jurisdiction**
Plaintiff brings a state-law claim for negligence against the City of New York, alleging that Rikers Island corrections officers caused him to slip and fall in a shower area on October 12, 2013. *See SAC ¶ 190–199.* Defendants move for summary judgment on this claim but have not addressed whether the Court properly has subject-matter jurisdiction over it.

Federal courts can exercise supplemental jurisdiction over state-law claims only if the claims "are so related to claims in the action within [the Court's] original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a). "Claims 'form part of the same case or controversy' if they 'derive from a common nucleus of operative fact.' " *Shahriar v. Smith & Wollensky Rest. Grp., Inc.,* 659 F.3d 234, 245 (2d Cir. 2011) (quoting *Briarpatch Ltd., L.P. v. Phoenix Pictures, Inc.,* 373 F.3d 296, 308 (2d Cir. 2004) ). "In determining whether two disputes arise from a 'common nucleus of operative fact,' [courts] have traditionally asked whether 'the facts underlying the federal and state claims substantially overlapped ... [or] the federal claim necessarily brought the facts underlying the state claim before the court.' " *Achtman v. Kirby, McInerney & Squire, LLP,* 464 F.3d 328, 335 (2d Cir. 2006) (quoting *Lyndonville Sav. Bank & Trust Co. v. Lussier,* 211 F.3d 697, 704 (2d Cir. 2000) ). Courts "have found pendent jurisdiction lacking when the federal and state claims rested on essentially unrelated facts." *Lyndonville,* 211 F.3d at 704 (collecting cases); *see also, e.g., Kirschner v. Klemons,* 225 F.3d 227, 239 (2d Cir. 2000).

*\*13* The Court has jurisdiction over this action pursuant to the Court's federal-question jurisdiction, based on Plaintiff's § 1983 claims for malicious prosecution and excessive force. [20] *See SAC ¶¶ 2–4.* Thus, this Court has jurisdiction over Plaintiff's state-law claims only if they "form part of the same case or controversy" as the § 1983 claims. 28 U.S.C. § 1367(a); *see also Shahriar,* 659 F.3d at 245. Plaintiff's claim relating to the slip-and-fall has no factual overlap whatsoever with his § 1983 claims. Among other things, the slip-and-fall claim involves different state actors, a different time period, and an entirely different injury than either of Plaintiff's § 1983 claims. *See Defs.'* 56.1 Stmt. ¶¶ 80–83; Pl.'s 56.1 Stmt. ¶ 118. This Court, therefore, has no jurisdiction to adjudicate Plaintiff's slip-and-fall claim; accordingly, this claim warrants dismissal.

The Court is aware, however, that it has raised this issue *sua sponte,* as Defendants did not move to dismiss this claim based on lack of subject-matter jurisdiction. [21] The Court, therefore, will allow Plaintiff until **March 22, 2019** to show cause why the slip-and-fall claim should not be dismissed for lack of subject-matter jurisdiction. Defendants may respond no later than **March 29, 2019.** If Plaintiff fails to timely explain why this Court has subject-matter jurisdiction over the slip-and-fall claim, the claim will be dismissed.

**VI. The Balance of Plaintiff's Claims**

**A. Plaintiff's Claim Against Robles for Malicious Prosecution**
Plaintiff also brings a claim against Robles for malicious prosecution, alleging that the punishments that Plaintiff received on Rikers Island for disciplinary infractions were "retaliatory" and lacked probable cause. SAC ¶¶ 132–143. Although Robles moved for summary judgment on this claim, *see Defs.'* Mem. of Law at 22, 30, Plaintiff offers no facts at all to support it, other than the conclusory assertion that "[i]t was clear that [his] placement in solitary confinement was punitive and retaliatory" and deposition testimony that falls far short of establishing Robles's personal involvement, malice, a lack of probable cause, or any of the other elements of the claim, *see Pl.'s* Mem. of Law at 24–25. Accordingly, Defendants' motion for summary judgment is also granted on this claim.

**B. Plaintiff's Claims Against the City of New York**

The balance of Plaintiff's claims are against the City of New York. Plaintiff brings claims against the City for malicious prosecution and excessive force pursuant to § 1983 and *Monell v. Dep't of Soc. Servs. of City of New York,* 436 U.S. 658 (1978). *See* SAC ¶¶ 200 –244. He also brings all of his state-law claims against the City pursuant to a *respondeat superior* theory. *See id.* On May 4, 2018, after discovery closed, the Court severed and stayed these claims pending resolution of Defendants' motion for summary judgment. *See* Order, Dkt. 83.

All of Plaintiff's claims against the City are dismissed, with the exception of the slip-and-fall claim and the claims arising out of the July 15, 2013 extraction incident. With the exception of those claims, Plaintiff has failed to establish that he suffered a constitutional violation or any other cognizable injury. Because *Monell* and *respondeat superior* liability is inherently derivative of individual liability, the City is not liable for those claims as a matter of law. *See Bolden v. Cty. of Sullivan,* 523 F. App'x 832, 834 (2d Cir. 2013) (citing *Segal v. City of New York,* 459 F.3d 207, 219 (2d Cir. 2006) ); *Escalera v. Lunn,* 361 F.3d 737, 749 (2d Cir. 2004); *Judith M. v. Sisters of Charity Hosp.,* 93 N.Y.2d 932, 933 (1999); *Du Chateau v. Metro-North Commuter R. Co.,* 253 A.D.2d 128, 131 (1st Dep't 1999).

*\*14* As to the claims relating to the extraction incident (excessive force and failure to intervene), the Court has not ruled out the possibility that Plaintiff suffered a constitutional violation; the Court has ruled only that Plaintiff failed to show that the named defendant, Robles, was responsible for the alleged violation. Accordingly, the Court will not dismiss these claims at this time. No later than **March 22, 2019,** Plaintiff must show cause why his claims against the City for excessive force and failure to intervene should not be dismissed. Defendants may respond no later than **March 29, 2019.** If Plaintiff fails to show timely cause, these claims will be dismissed.[22]

## CONCLUSION

For all the foregoing reasons, Defendants' motion for summary judgment is GRANTED. All of Plaintiff's claims are DISMISSED, with the exception of his claim against the City of New York for negligence arising out of the October 12, 2013 slip-and-fall incident and his claims against the City of New York for excessive force and failure to intervene arising out of the July 15, 2013 cell extraction. No later than **March 22, 2019,** Plaintiff must show cause why those claims should not be dismissed. Defendants may respond no later than **March 29, 2019.** There will be no reply. The parties submissions must be in **letter format** and may not exceed **five pages.** If Plaintiff fails to show timely cause, these claims will be dismissed, and this action will be closed.

The Clerk of Court is respectfully directed to CLOSE the open motions at Dkts. 86 and 107.

**SO ORDERED.**

**All Citations**

Slip Copy, 2019 WL 1115053

### Footnotes

1          All facts herein are undisputed unless otherwise stated. The Court will refer to the exhibits to the Declaration of Carolyn K. Depoian, Dkt. 87, as "Defs.' Exs." The Court will refer to the exhibits to the Declaration of Ellie A. Silverman, Dkt. 102-2, as "Pl.'s Exs." The Court will refer to the Declaration of Joseph A. Pollini, Dkt. 102-1, as "Pollini Decl."

2          Citing to his deposition, Plaintiff argues that he did not refuse to remove his hand after being sprayed with the chemical agent and that he did not charge the extraction team's shield. *See* Pl.'s 56.1 Stmt. ¶¶ 69, 71 (citing Defs.' Ex. D at 218). The cited page of his deposition does not support Plaintiff's assertion. *See* Defs.' Ex. D at 218. In any event, a video of the incident makes clear that Plaintiff refused to remove his hand after being sprayed and charged the extraction team's shield. *See* Defs.' Ex. Q at 8:15–9:45.

3          Plaintiff also asserts that his "right eyelid was split open as a result of the incident." Pl.'s 56.1 Stmt. ¶ 75 (citing Pl.'s Ex. C at 221); the page of Plaintiff's deposition that he cites for this point, however, was not included in the submissions that the parties filed with this Court. Moreover, the video recording of the extraction shows that Plaintiff did not have visual injuries to his

face after the extraction was complete. *See* Defs.' Ex. Q at 10:45–10:55, 11:18, 11:40–11:55, 12:10–12:30.

4    Defendants assert that they repeatedly asked Plaintiff to withdraw his claims against Lynton and Valerio, due to these parties' absolute immunity from suit. *See* Defs.' Reply Mem. of Law, Dkt. 103, at 1 n.1. According to Defendants, Plaintiff refused to dismiss these parties, requiring Defendants to spend time and pages moving for summary judgment on the claims against these parties—before Plaintiff simply agreed to dismiss these parties in his response brief. *See id.* If Defendants' version of these facts is correct, then Plaintiff's counsel has needlessly wasted the time and resources of her adversary and this Court. This Court has warned Plaintiff's counsel against engaging in these types of wasteful and dilatory tactics. *See* Tr. of Nov. 3, 2017 Conf. at 13. Plaintiff's counsel is again warned that this conduct will not be tolerated in the future.

5    To be clear, Plaintiff's response papers state that he agrees to dismiss D'Amato only from his § 1983 claim for malicious prosecution. *See* Pl.'s Mem. of Law at 8 n.4. Plaintiff sued D'Amato for a number of other claims, including false arrest and intentional infliction of emotional distress. *See* SAC. Plaintiff, however, offers no basis for holding D'Amato liable for these claims; indeed, other than the statement withdrawing the § 1983 claim against D'Amato, Plaintiff's response papers do not mention D'Amato even once. Summary judgment is therefore appropriate on all claims against D'Amato.

6    Plaintiff argues that the decision to charge Plaintiff was made "mutually" between Ramos and the DA's Office, as Ramos "advised the prosecutor concerning the appropriate course of action" during his telephone call. Pl.'s Mem. of Law at 9; *see also id.* at 4; Pl.'s 56.1 Stmt. ¶¶ 39–40, 100. Plaintiff, however, cites no evidence for this assertion other than a document that was not included in the parties' submissions, *see* Pl.'s 56.1 Stmt. ¶ 100 (citing Pl.'s Ex. B at D11), and a page from Ramos's deposition, *see id.* (citing Defs.' Ex. J at 24). In that portion of the deposition, Ramos testified that the DA's Office *instructed him* "to go forward and make an arrest," Defs.' Ex. J at 24. There is, therefore, no basis in the record to infer that the decision to charge Plaintiff was made "mutually" between the Police Defendants and the DA's Office.

7    Plaintiff points out that the evidence that the Police Defendants investigated his alibi is based entirely on their deposition testimony, as Plaintiff's cell phone records are not in the police's case file. *See* Pl.'s 56.1 Stmt. ¶ 113. From this premise, Plaintiff leaps to the conclusion that the Police Defendants must not have obtained the records. *See id.* To support this assertion, Plaintiff cites to the declaration of his expert witness, who stated that, in his opinion, "[i]f information is not properly documented in a case, then it did not happen." Pollini Decl. ¶ 31. This conclusion is far too speculative to be admissible expert opinion—and, in fact, defies common sense and borders on frivolous. Plaintiff offers no admissible evidence to dispute the Police Defendants' deposition testimony that they investigated his alibi.

8    Plaintiff argues that "[a]t some point during the investigation," Mwewa viewed a different photo array containing Plaintiff's picture and failed to identify Plaintiff in the array. Pl.'s 56.1 Stmt. ¶ 110 (citing Pl.'s Ex. B at D35); *see also* Pl.'s Mem. of Law at 3. The document that Plaintiff cites does not support this assertion, *see* Pl.'s Ex. B at D35, and the Court is unaware of any other evidence that supports it. Additionally, Plaintiff argues that the photo of Plaintiff in the array was more than six years old, *see* Pl.'s 56.1 Stmt. ¶ 112, but, again, the evidence that Plaintiff cites for this assertion does not support it.

9    The case file, for example, states that Mwewa was "sweating heavily" during the lineup and that Mwewa repeatedly told Ramos, "I won't give or say the number." Defs.' Ex. G at D184.

10    Even if this evidence were not sufficient to establish probable cause—which it is—because the Police Defendants are entitled to qualified immunity, they need only show that the prosecution was supported by "arguable" probable cause in order to prevail on these claims. *Cerrone v. Brown*, 246 F.3d 194, 202–03 (2d Cir. 2001).

11    The Court also notes that Plaintiff offers no evidence that the failure to collect DNA from inside the victim's pockets was motived by malice, which is an element of a malicious prosecution claim. Rather, Gibson testified in his deposition that DNA was not collected from the pants pockets because Gibson was unaware at the time that DNA could be collected from clothing. *See* Pl.'s Ex. A at 84. Gibson testified that "if [he] had known at the time that [he] could get the DNA from the pants," he would have swabbed them for DNA. *Id.* at 85.

12    In any event, the DNA evidence did not establish that the charges against Plaintiff were groundless. The City Medical Examiner excluded Plaintiff as a DNA contributor only "where comparisons could be made," Def.'s 56.1 ¶ 44; Pl.'s 56.1 ¶ 44; other DNA samples from the crime scene had been insufficient for testing, *see* Def.'s 56.1 ¶ 45; Pl.'s 56.1 ¶ 45, leaving open the possibility that Plaintiff could have been a contributor to those samples.

13    At a conference on January 12, 2018, the Court discussed the scope of expert discovery with the parties; Plaintiff stated that he would call an expert in "police practices and procedure" and an expert in "Department of Corrections procedures." Tr. of Jan. 12, 2018 Conf. at 3. Plaintiff made no mention at this conference that he required any expert witnesses on the issue of emotional distress. *See id.* After Defendants submitted their motion for summary judgment, the Court allowed Plaintiff to explain whether he required expert witnesses to respond to Defendants' motion. *See* Order (May 4, 2018), Dkt. 83. Plaintiff stated that he required an expert on "police practices" to respond to the motion, *see* Ltr. (June 15, 2018), Dkt. 90, and the Court allowed Plaintiff to include that expert's testimony in his response papers, *see* Order (July 9, 2018), Dkt. 97; *see also* Pollini Decl. But Plaintiff again did not indicate that he needed an expert witness to help prove his IIED claim. In short, Plaintiff had every opportunity to submit expert testimony relating to emotional distress; Plaintiff simply chose not to.

14    In a video of the incident, each member of the extraction team identified himself by name and shield number. *See* Defs.' Ex Q at 1:00–1:40. Plaintiff, therefore, has no excuse for failing to conduct discovery of these individuals.

15    *See Provost*, 262 F.3d at 155; *see also, e.g., Jutrowski v. Twp. of Riverdale*, 904 F.3d 280, 291–92 (3d Cir. 2018) (affirming grant of defendants' motion for summary judgment in an excessive-force case when the plaintiff "filed suit against only four of the five [officers involved] and still [could not] identify the actor that kicked him"); *Colbert v. City of Chicago*, 851 F.3d 649, 657 (7th Cir. 2017) (affirming grant of defendants' motion for summary judgment when the plaintiff sued only four out of ten officers involved in an allegedly illegal search and the plaintiff "admitted that he was unable to identify which of the ten searching officers" were responsible); *Kornegay v. Doe*, 371 F. App'x 178, 179 (2d Cir. 2010) (affirming grant of defendants' motion for judgment as a matter of law in a § 1983 claim when the plaintiff, "in his own sworn testimony ... failed to attribute specific actions to any individual defendant"); *Husbands ex rel. Forde v. City of New York*, 335 F. App'x 124, 129 (2d Cir. 2009); *Rasmussen v. City of New York*, 766 F. Supp. 2d 399, 411–12 (E.D.N.Y. 2011).

16    *See, e.g., Medina v. Donaldson*, No. 10-CV-5922, 2014 WL 1010951, at *14 (E.D.N.Y. Mar. 14, 2014) (denying defendant's motion for a judgment as a matter of law; a reasonable juror could find that the defendant caused the plaintiff's injuries based on evidence of the defendant's physical position during the incident, his "arguably violent actions" in the moments preceding the assault, and inconsistencies in the testimony of the other officers involved); *Lasher v. City of Schenectady*, No. 02-CV-1395, 2004 WL 1732006, at *7 (N.D.N.Y. Aug. 3, 2004) (denying defendant's motion for summary judgment because the plaintiff's testimony about the height of the officer who assaulted him matched the defendant's height).

17    The Court also notes that the time during which officers could have hit and kicked Plaintiff lasted only approximately 30 seconds, judging from a video of the incident. *See* Defs.' Ex. Q at 9:45–10:20. At least one court has held that this amount of time is insufficient for a reasonable jury to conclude that the

defendant had a realistic opportunity to intervene. *See Sash*, 674 F. Supp. 2d at 545.

Plaintiff's excessive-force claims focus on the officers' alleged kicks and punches during the cell extraction. *See* Pl.'s Mem. of Law at 20–21. To the extent that Plaintiff argues that the officers' acts of spraying him with a chemical agent and of removing him from his cell constitute excessive force, his argument would fail. No reasonable juror could find that these applications of force were excessive, in light of the safety risks that Plaintiff's actions posed, the intermediate steps that the officers took before using force (including ordering Plaintiff to remove his hand and having a mental health professional speak with Plaintiff), and the minimal injuries that Plaintiff sustained. *See* Defs.' 56.1 Stmt. ¶¶ 64–68. In addition, as the Court has discussed, Plaintiff has failed to establish Robles's personal involvement in these or any other actions.

18    Plaintiff also argues that he need not offer evidence of Robles's personal involvement because Robles was "obviously acting in concert with the other officers" in depriving Plaintiff of his constitutional rights. Pl.'s Mem. of Law at 22. Putting aside the conclusory nature of this assertion (which is made without any citations to the record), Plaintiff has not brought a claim for § 1983 conspiracy, of which "acting in concert" would be an element. *See Samuels v. Fischer*, 168 F. Supp. 3d 625, 650 n.13 (S.D.N.Y. 2016). Rather, Plaintiff has brought a substantive § 1983 claim, for which there is "no basis for vicarious or shared liability" among different officers. *Rasmussen*, 766 F. Supp. 2d at 412.

19    Although Plaintiff's state-law claim for excessive force does not contain the same "personal involvement" requirement as his § 1983 claim, the state claim—like any other intentional tort—requires Plaintiff to prove that Robles's actions proximately caused his injuries. *See Hain v. Jamison*, 28 N.Y.3d 524, 528 (2016); *Reynolds v. State*, 118 A.D.3d 1496, 1496 (4th Dep't 2014); *Rodriguez v. City of New York*, 112 A.D.3d 905, 907 (2d Dep't 2013); *Flores v. Dearborne Mgmt., Inc.*, 24 A.D.3d 101, 102 (1st Dep't 2005). Because Plaintiff has failed to offer any evidence of this element, his state-law claim also fails.

20    Plaintiff is a citizen of the same state as Defendants and, thus, does not rely on the Court's diversity jurisdiction. *See* SAC ¶ 9.

21    Defendants argued in their motion for summary judgment that the Court, in its discretion, should decline to exercise supplemental jurisdiction, pursuant to 28 U.S.C. § 1367(c)(3). *See* Defs.' Mem. of Law at 27. This argument missed the mark: because the slip-and-fall claim does not arise out of the same case or controversy as Plaintiff's § 1983 claims, this Court has no discretion to exercise supplemental jurisdiction over it. Plaintiff, therefore, has not yet had an opportunity to respond to the argument that the Court lacks subject-matter jurisdiction over the claim altogether.

22    Ordinarily, the Court would order Defendants to move for summary judgment on Plaintiff's remaining claims. Plaintiff, however, has failed to conduct any discovery on his *Monell* claims, despite having ample time to do so. *See* Tr. of May 19, 2017 Conf. at 9 (Plaintiff agrees to "proceed with discovery on *Monell*" concurrent with discovery on his claims against the individual defendants); Tr. of Nov. 3, 2017 Conf. at 5–6, 13 (Plaintiff states that he inadvertently failed to serve discovery demands relating to his *Monell* claims; the Court denies Plaintiff's request to reopen *Monell* discovery). The Court, therefore, has serious doubts that Plaintiff's claims could withstand a motion for summary judgment. As the Court has discussed, moreover, Plaintiff's sloppy and dilatory practices have already caused Defendants to incur substantial costs without good reason. In light of these circumstances, the Court is ordering Plaintiff to show cause why the claims should not be dismissed, instead of requiring Defendants to expend resources filing another motion for summary judgment. *See* Fed. R. Civ. P. 56(f) (Court may grant summary judgment on its own motion after providing notice and a reasonable time to respond).

End of Document                    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

WestlawNext. © 2019 Thomson Reuters   Thomson Reuters Privacy Policy

Thomson Reuters is not providing legal advice   THOMSON REUTERS

## AFFIDAVIT OF SERVICE

STATE OF NEW YORK }
                                     } ss.:
COUNTY OF ST. LAWRENCE }

F I L E D
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★  APR 2 2 2019  ★

BROOKLYN OFFICE

I, Willie Brown being duly sworn, depose and say:

that on the 17 day of APRIL , 2019 , I submitted for mailing, the following documents:

A) Affidavit of Service & Arrest Report
B) D.A. Declined Prosecution & Exhibits
C) Civil Rights complaint 1983
D) Summons in A Civil Action

in a box maintained at the Riverview Correctional Facility, located at 1110 Tibbits Drive, P.O. Box 247, Ogdensburg, New York 13669, to be mailed via the United States Postal Service, First Class Mail to the following parties:

1) United States District Court Eastern District Court 225 Cadman Plaza East Brooklyn, N.Y. 11201

2) _____

3) _____

4) _____

Respectfully submitted,

Willie Brown
Signature of Affiant

Sworn to before me this 17th day of April , 20 19 .

Helga Ross
NOTARY                              PUBLIC

HELGA ROSS
Notary Public, State of New York
Registration No. 01RO6058468
Qualified in St. Lawrence County
My Commission Expires 05/14/20 19

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★       APR 22 2019       ★

BROOKLYN OFFICE

HELGA ROSS
Notary Public, State of New York
Registration No. 01RO6056848
Qualified in St. Lawrence County
My Commission Expires 05/14/20___